UNITED STATES of America

v.

The LaROUCHE CAMPAIGN, Independent Democrats for LaRouche, Campaigner Publications, Inc., Caucus Distributors, Inc., Lyndon H. LaRouche, Paul Goldstein, Jeffrey Steinberg, Michelle Steinberg, Robert Greenberg, Edward Spannaus, John Scialdone, National Caucus of Labor Committees, Defendants.

Crim. No. 86–323–K.

United States District Court, D. Massachusetts.

April 8, 1988.

Odin P. Anderson, Anderson & Associates, P.C., Boston, Mass., for Lyndon LaRouche, Jr.

Michael W. Reilly, Hausserman, Davison & Shattuck, Boston, Mass., for Nat. Caucus of Labor Committees.

Daniel S. Alcorn, Fensterwald & Alcorn, Arlington, Va., for Paul Goldstein.

Matthew H. Feinberg, Boston, Mass., for Caucus Distributors, Inc. and Campaigner Publications, Inc.

William B. Moffitt, William B. Moffitt & Associates, Alexandria, Va., for Jeffrey Steinberg.

Thomas Shapiro, Shapiro & Grace, Boston, Mass., for The LaRouche Campaign and Independent Democrats for LaRouche.

Mayer Morganroth, Southfield, Mich., for Edward Spannaus.

Robert F. Collins, Braintree, Mass., for Robert Greenberg.

James E. McCall, Boston, Mass., for John Scialdone.

William Cummings, Alexandria, Va., for Michelle Steinberg.

## MEMORANDUM AND ORDER

KEETON, District Judge.

All defendants have joined in motions to dismiss, and in the alternative for lesser sanctions, because of alleged governmental violations of obligations (1) to disclose exculpatory material in accordance with *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, (2) to make disclosures in accordance with Rule 16 of the Federal Rules of Criminal Procedure, (3) to make disclosures in accordance with an agreement among counsel, and (4) to disclose the identity of "informants" under *United States v. Roviaro*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), and its progeny. After preliminary hearings, the court determined that defendants, in relation to some of the issues presented by these motions, had satisfied

the requirements for an evidentiary hearing set forth in a previous memorandum of the court in this case, *United States v. The LaRouche Campaign,* 682 F.Supp. 610, 621–22 (D.Mass.1987). Although the evidentiary hearing bearing upon some issues is not yet complete, the court has considered oral and written submissions bearing upon other issues as to which rulings in limine are appropriate.

### I. Background of the Alleged Violations

The Federal Bureau of Investigation ("FBI") has adopted a practice of preparing memoranda of interviews recording potentially "testimonial" matters in a form designated FD–302 ("302") and memoranda regarding matters expected to be "non-testimonial" in nature in a form designated as an insert ("Insert"). In most criminal cases, the government discloses to defense counsel some but not all 302s and Inserts bearing upon the subject matter of the trial. If a 302 or Insert contains some protected or privileged materials in addition to those the government is required to disclose, or chooses to disclose voluntarily, redacted copies are disclosed.

█ Under *Brady* the government must disclose "exculpatory" material in its possession, including any such material appearing in 302s and Inserts, and, at least in relation to "exculpatory" material other than evidence that is "exculpatory" only insofar as it tends to impeach the testimony of a government witness, the government is ordinarily expected to make disclosure before trial commences. Pursuant to the Jencks Act, 18 U.S.C. § 3500, the government ordinarily discloses "statements" of government witnesses after they have testified on direct examination unless it voluntarily or by agreement does so earlier, or is ordered after hearing to do so earlier for exceptional reasons.

Under an agreement arrived at among counsel at a meeting on February 26, 1987 and memorialized in a letter to the government dated March 3, the government undertook, among other things, to provide defense counsel with information concerning each witness's relationship with any government agencies or departments.

█ Finally, under *Roviaro* the government is obligated, in some circumstances, to reveal to defense counsel the identity of an informant where doing so would be relevant and helpful to the defense of the accused. Nondisclosure, where *Roviaro* applies, violates due process.

Circumstances giving rise to a need for an evidentiary hearing in this case have arisen while the case is in trial. Approximately 55 days into trial, the government provided defense counsel with 302s for Ryan Quade Emerson, a person listed as a witness on the government's trial list at that time. Defendants maintain that the government was obligated, under at least one of the theories described above, to turn over the 302s *before* trial. In addition, defendants argue that a hearing is necessary to ascertain the exact nature of Emerson's relationship with the FBI, given (1) the government's admission that Emerson had been asked by the FBI (on at least one occasion) to provide information on the NCLC, and (2) the government's reliance on a notebook entry attributed to Emerson in the government's opening statement.

Almost simultaneously, and independently, a Freedom of Information Act ("FOIA") request directed to the Independent Counsel's office revealed a telex from Richard Secord to Oliver North suggesting that "information" had been collected on Lyndon LaRouche. After the telex was brought to the government's attention, defense counsel were provided with documents tending to show that individuals identified as Lewis, Howard, and Tucker claim to have infiltrated entities associated with LaRouche at the request of the FBI. Defendants argue that these documents are exculpatory and that the government has violated its *Brady* obligation by failing to turn them over before trial.

### II. Disclosure Requirements Dependent on Unsettled Issues of Substantive Law

#### A. Introduction

The government is subject to several distinct disclosure requirements in criminal

cases, including those ordinarily referred to as *Brady*, Rule 16, *Roviaro*, and Jencks Act obligations, as well as obligations to comply with any agreement of counsel or order of the court distinctive to a particular case.

The scope of every such disclosure obligation of the government is defined in part by express or implied terms bearing upon some relationship to issues or potential issues in the case before the court. The nature of the necessary relationship varies with the source and nature of the obligation of disclosure. At a minimum, some degree of likelihood of relevance to some disputable issue of fact or law is implicitly, if not explicitly, a prerequisite to every obligation of disclosure. *See United States v. Gallo*, 653 F.Supp. 320, 329 (E.D. N.Y.1986).

Precedents establish that something more than a likelihood of relevance may be required even to establish an obligation of disclosure. *Cf. United States v. Ehrlichman*, 546 F.2d 910, 930 & n. 96 (D.C.Cir. 1976). Moreover, when a court determines that a violation has occurred, a further requirement of some showing regarding its effect, or likely effect, may be a prerequisite to relief. That further requirement must be fashioned with a view to maintaining a reasonable "fit" between the nature and scope of the violation and the nature and scope of the relief.

The meaning of any relevance requirement, regardless of how minimal or stringent the standard of relevance may be, depends, in part, on the substantive criminal law definitions of the offenses charged in the indictment and any affirmative defenses asserted. Nevertheless, close reading of the many precedents regarding disclosure obligations in criminal cases reveals that only rarely has a decision regarding disclosure turned on the resolution of a disputed issue of substantive law. That is, in most instances, the applicable substantive law was not in dispute, or the nature of any dispute about substantive law was not material to definition of the disclosure requirement. Rather, the controversy regarding disclosure centered on other issues. Still, on reflection it is obvious that when an unresolved dispute exists regarding the substantive law defining a criminal offense, and a defendant makes a demand for disclosure that is premised on the defendant's position on that disputed issue, the court may not be able to determine whether the government has an obligation of disclosure without first ruling on the disputed issue of substantive law.

Some of the disclosure disputes in the present case are within that exceptional category of disputes that cannot be resolved without first addressing disputed issues of substantive law.

### B. Elements of the Charged Conspiracy to Obstruct Justice

#### 1. Introduction

The point in criminal proceedings at which ordinarily the sharpest focus occurs on the elements of each offense charged is the trial court's charge to the jury (and, of course, appellate consideration of any objections to the charge). Thousands of jury charges in criminal cases have defined and explained the elements of a conspiracy; hundreds, at least, have defined and explained the elements of a conspiracy to obstruct justice. Yet few reported decisions bear directly upon certain issues in dispute in this case. Indeed, one may conclude that no reported decision has precisely addressed some of these issues.

Having considered the submissions now before me, at a point no more than halfway through a trial expected to last more than six months, I will begin to focus the substantive law issues by summarizing the elements of the charged obstruction of justice, initially, in language ordinarily used to explain them to a jury and then in a way that addresses ambiguities lurking in some commonly used phrases.

The distinct elements of an offense of conspiracy to obstruct justice, each of which the government must prove beyond reasonable doubt, may best be understood as involving, first, the elements of an offense of obstruction of justice, and, second, the elements of the offense of the conspiracy to obstruct justice that is charged in the case on trial.

### 2. The Offense of Obstructing Justice

The obstruction-of-justice statute applicable to this case provides in relevant part:

> Whoever ... corruptly ... endeavors to influence, obstruct, or impede, the due administration of justice ... [shall be guilty of a crime].

18 U.S.C. § 1503.

It is common practice for trial judges to charge the jury that the offense of obstruction of justice involves two elements: (1) that the defendant endeavored to obstruct the due administration of justice, and (2) that the defendant acted knowingly, willfully, and corruptly. Trial judges are free to fashion a somewhat different structure than this, and often do. For the purpose of added clarity of focus on the issues presented in this case, I will break the definition of obstruction of justice into three elements: (1) that the defendant endeavored to cause (2) an obstruction of the due administration of justice (hereafter, "an obstruction") (3) knowingly, willfully, and corruptly.

The first element of this definition of obstruction of justice concerns the defendant's act. The second concerns the defined event—an obstruction—that was an objective of the act. The third concerns the added requirements regarding the state of mind of the defendant. It may be observed that the first element, as well as the third, involves a state-of-mind standard. Proof that the defendant "endeavored to cause" a defined event necessarily implies proof that the defendant had a state of mind concerned with an objective of the defendant's act—that is, with bringing about the defined event. The third element, however, adds more to what the government must prove about the defendant's state of mind. The government must prove not only that the defendant endeavored to cause an obstruction but also that the defendant did so knowingly, willfully, and corruptly.

An obstruction as used in the second element, as applied to the offense charged in the present case, means any of the "actions" described in the list of seven below. The term "actions" implicitly involves two separable aspects. One concerns what may appropriately be called an "event." The other concerns an aspect of the state of mind of an actor. Expressed another way, the point is that the term "actions," commonly used in describing the second element of an offense of obstruction of justice, is another term that, like "endeavored to cause," may be understood as involving to some extent a state of mind of the defendant, because in ordinary discourse we do not refer to an "event" (or "consequence") as an "action" of a particular person unless that person had a state of mind that leads us to say the defendant "acted" with some kind of thought about causing that event to occur. For present purposes, I will use the term "events" rather than "actions" in considering the second element, postponing discussion of all aspects of the state of mind of the actor for treatment as part of the third element.

The government contends in this case that any of the following seven events would constitute an obstruction, satisfying the second element of the offense of obstruction of justice:

(1) refusing to deliver documents to a grand jury if the grand jury has issued a subpoena for those documents; or

(2) destroying documents for which a grand jury has issued a subpoena; or

(3) destroying documents for which a grand jury has not yet issued a subpoena as to which the person or persons involved in the destruction knows that a subpoena is likely; or

(4) refusing to obey a court order which directs that documents be delivered to the grand jury; or

(5) counseling, encouraging or suggesting that a person move from one location to another to make it more difficult for that person to be questioned by the grand jury; or

(6) counseling, encouraging, suggesting or engaging in any action for the purpose of intimidating law enforcement officials, the court or the grand jury; or

(7) counseling, encouraging, suggesting or engaging in any action which delays the questioning of the grand jury.

Government's Requested Instruction No. 20, *Actions Constituting Obstruction* (Docket No. 1028).

We come now to the third element—the state-of-mind requirement. Several ambiguities often exist in instructions on state-of-mind elements of criminal offenses. The ambiguities are especially troubling in relation to the offense of obstruction of justice because the statute defining the offense uses the term "corruptly." Though not unique in this respect, it is among a rather small percentage of statutes that use "corruptly" in defining criminal offenses, and few judicial decisions have focused explicitly on the meaning of "corruptly."

One ambiguity concerns a distinction, often observed in precedents, between motive and intent. In a pattern instruction, often used, juries are told:

Intent and motive should never be confused. Motive is what prompts a person to act, or fail to act. Intent refers only to the state of mind with which the act is done or omitted.

Devitt & Blackmar, *Federal Jury Practice and Instructions* § 14.11, at 395 (3d ed. 1977). Standing alone, this instruction falls far short of explaining the distinction well enough to enable either a jury or a judge to apply it. The two paragraphs that follow in the pattern instruction from which the foregoing quotation was taken can be helpful.

Personal advancement and financial gain are two well-recognized motives for much of human conduct. Those laudable motives may prompt one person to voluntary acts of good, another to voluntary acts of crime.

Good motive alone is never a defense where the act done or omitted is a crime. So, the motive of the accused is immaterial except insofar as evidence of motive may aid determination of state of mind or intent.

*Id.*

The government argues that these instructions, as well as more elaborate instructions on the same theme and precedents supporting them, show that motive cannot constitute a defense and that any contention that defendants acted with a motive such as serving the national interest by complying with what they believed to be a request made to them to cause documents to be burned and witnesses transported is irrelevant as a matter of law. In the present context, at least, the point that good motive cannot constitute a defense is surely correct. The legal significance of the point in relation to issues now before the court is less clear.

It has long been customary in ordinary legal discourse to use "intent" and "purpose" to describe a person's state of mind focused upon bringing about defined physical consequences, and to use "motive" to describe the more remote objective which inspires the person to act. Cook, *Act, Intention and Motive in the Criminal Law*, 26 Yale L.J. 644 (1917). All these terms ("intent," "purpose," and "motive") are steps removed from volition to move a part of the body—for example, to move a finger in pulling the trigger of a gun. "Intent" and "purpose" are concerned with consequences of the movement. "Motive" is concerned with reasons for desiring certain consequences. Each of these terms, of course, concerns a state of mind.

The problem of applying these concepts to resolve one of the issues now pending in this case is complicated by the fact that even if we conclude that an objective of serving national interest may be aptly described as a "motive," it does not necessarily follow that it may not also be described as a "purpose" of an act that is also aimed at bringing about some physical consequences. Moreover, even assuming that it is a correct proposition that the "good motive" of serving some national interest is not a defense, we must nevertheless examine issues concerning any other theories of rebuttal of the elements of the crime.

**1272**

Thus, we must consider among other issues, those concerning what state of mind of "intent" or "purpose" must be proved beyond reasonable doubt to establish essential elements of the crimes charged. For these reasons, I conclude that no issues before me can be resolved by merely accepting the government's contention that good motive is not a defense. Nor can issues before me be resolved by a contrary ruling regarding motive such as defendants have suggested; for reasons stated in Part IV, I conclude that the "CIA defense" asserted by defendants must be rejected.

A second ambiguity often existing in instructions on state-of-mind elements concerns the meaning of "intent" and "specific intent." Many criminal statutes include "intent" as an element of each offense defined, and many judicial opinions have interpreted statutes as imposing a requirement of "specific intent." Each of these terms in itself, however, is open to either of two sharply conflicting interpretations (as well as many other shades of meaning): first, that in relation to any defined event "intent" (or at least "specific intent") exists only if the actor, when acting, has a *purpose* to bring about that event; second, that the element of "intent" (and perhaps "specific intent" as well) is satisfied if the actor, when acting, had *either* a purpose to bring about that event *or* knowledge that the act would be a contributing factor in bringing about that event. *See, e.g.,* Model Penal Code § 2.02. If the latter interpretation of the obstruction-of-justice statute is adopted, the government need only prove that a defendant knew that the defendant's act would contribute to bringing about one of the events constituting an obstruction and need not prove that the defendant, when acting, had a purpose to bring about one of the defined events (or, perhaps, something like it).

If a statute is interpreted as requiring proof of purpose (rather than proof of *either* "purpose" *or* "knowledge") that an act contribute to bringing about a defined event, a third ambiguity remains. Does "purpose" mean "sole purpose," or "primary purpose," or instead is the "purpose" element satisfied if the government proves

that a defendant's state of mind when acting included as at least one of the defendant's purposes (even if not the primary or dominant one) that the act contribute to bringing about one of the defined events?

Few jury charges and few appellate opinions address any of these ambiguities explicitly. Of course, if the only requests for instruction submitted to a trial court carry such ambiguities in them, and the court's instructions to the jury carry such ambiguities without objection by any party, both the trial court and the appellate courts may choose to leave a resting stone unturned. In this case, however, conflicting contentions of counsel have become apparent as trial has proceeded, and indeed the government has filed and defense counsel have opposed a motion for certain in limine rulings on the expected state-of-mind element of the charge to the jury. The government has sought such rulings because of their potential bearing upon, first, the admissibility of evidence defense counsel seek to elicit by cross-examination of government witnesses (as well as evidence they may offer at other points later in trial) and, second, the scope of discovery obligations.

For these reasons, I have concluded that I should make some in limine rulings on the state-of-mind element of the charge of conspiracy to obstruct justice. I do so, however, with notice to the parties that I will be prepared to reconsider if, before the time comes for the charge to the jury, developments in this trial or in the precedents available for guidance persuade me that any of the in limine rulings is not entirely correct.

▪ I conclude that the second of the ambiguities identified above should be resolved against the government. Thus, I expect to charge the jury, if so requested by defense counsel, that in order to satisfy the obstruction-of-justice-state-of-mind requirement (the third element of the offense, as formulated above), the government must prove beyond reasonable doubt, among other things, that a defendant "acted corruptly" and that this means acted with a *purpose* to obstruct justice by bring-

ing about one of the seven events described above in this Memorandum, or some other event that constitutes an obstruction of justice. A finding by the jury that a defendant acted with knowledge that the act would contribute to bringing about such an event, but without such a purpose, would not satisfy the state-of-mind element of an offense of obstruction of justice. Several reported opinions tend to support this conclusion, whether or not they should be construed as so holding, in the strictest sense. *See, e.g., United States v. Cintolo,* 818 F.2d 980, 991 (1st Cir.1987) (stating that "§ 1503 criminalizes conduct which obstructs or impedes the due administration of justice, provided such conduct is undertaken with a corrupt or improper purpose"); *United States v. Jeter,* 775 F.2d 670, 679 (6th Cir.1985) (stating that § 1503 requires one to "impede the due administration of justice with the general intent of knowledge *as well as the specific intent of purpose to obstruct*") (emphasis in original); *United States v. Rasheed,* 663 F.2d 843, 852 (9th Cir.1981) (holding that "corruptly," within the meaning of § 1503, "means that the act must be done with the purpose of obstructing justice"), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982). I conclude that I must adhere to the foregoing precedents, including a First Circuit decision, despite the existence of precedent that is basically contrary to this position. *See, e.g., United States v. Silverman,* 745 F.2d 1386, 1393 (4th Cir.1984) (stating that "[t]he government is not required to prove ... that the defendant harbored the specific purpose of obstructing the due administration of justice"); *United States v. Buffalano,* 727 F.2d 50, 54 (2d Cir.1984) (stating that intent "may be inferred from proof that defendant had knowledge or notice that his corrupt actions would obstruct justice").

I conclude that the third of the ambiguities identified above should be resolved, in part at least, against defendants. This conclusion is strongly supported in principle by the reality that a "sole purpose" test would, if literally and faithfully applied, confine the sphere of the statute so narrowly as to be inconsistent with any rea-

soned conclusion as to the meaning manifested by Congress in enacting the statute. Experience teaches us that human beings seldom act for a "sole purpose." To read the statute as imposing on the government a burden of proving "sole purpose" beyond reasonable doubt would leave the statute with minimal practical effect—an outcome plainly inconsistent with the manifested statutory objective of substantial deterrence to obstruction of justice. Also, the conclusion is supported by precedent. *See, e.g., United States v. Jackson,* 513 F.2d 456, 461 (D.C.Cir.1975) (remarks alleged to have been intimidating must "have been motivated *at least partly by a purpose* to deter further testimony") (emphasis added); *United States v. Fayer,* 523 F.2d 661, 663 (2d Cir.1975) (saying—arguably as dictum—that § 1503 is violated by conduct done in whole or in part for an improper purpose). Also supporting this conclusion is the close analogy to precedents holding that even if a violation of a federal law is "a secondary" or "a minor" purpose of a conspiracy, the existence of such a purpose is sufficient to satisfy the object-of-the-conspiracy element of a conspiracy to violate that federal law. *See, e.g., Anderson v. United States,* 417 U.S. 211, 226, 94 S.Ct. 2253, 2263, 41 L.Ed.2d 20 (1974); *Ingram v. United States,* 360 U.S. 672, 679–80, 79 S.Ct. 1314, 1320, 3 L.Ed.2d 1503 (1959).

Defense counsel have argued that the First Circuit's opinion in *Cintolo* should be read as requiring "sole purpose," and it is true that some passages in the opinion might bear that interpretation. For example, at one point the opinion states: "Correct application of § 1503 thus requires, in a very real sense, that the factfinder discern ... *the motive* which led an individual to perform particular actions." 818 F.2d at 991 (emphasis added). At another point, the opinion quotes from a precedent saying "[t]he focus [under § 1503] is on *the* intent or motive of the party charged ...", *id.* at 992 (emphasis added), and at several points the opinion uses "the corrupt intent" or like phrases. *Id.* at 992–96. Elsewhere, however, the opinion speaks of "a corrupt or improper purpose," *id.* at 991, speaks

several times of "a corrupt motive," *id.* at 991–92, and, more significantly, expresses agreement with the opinion in *United States v. Fayer*, 523 F.2d 661 (2d Cir.1975), remarking, "the panel [of the Second Circuit] took pains to point out that advising a witness to plead the fifth amendment could violate § 1503 if done *in whole or in part* for an improper purpose." 818 F.2d at 993 n. 7 (emphasis added).

■ For the foregoing reasons, I expect to charge the jury, if so requested by the government, that in order to satisfy the obstruction-of-justice-state-of-mind requirement (the third element of the offense, as formulated above), the government need not prove that a defendant's sole purpose was to contribute to bringing about one of the seven events described above.

I conclude that I need not resolve at this time (in order to determine issues of relevance and admissibility presented at the present hearing) the issue as to whether a purpose to contribute to bringing about one of the described events must be a primary or dominant purpose, or need only be a purpose that is at least one of the purposes present in the defendant's mind at the time of acting. I will reserve decision on this issue until a later time in trial. Regardless of which way this issue is resolved, the applicable substantive law recognizes the factual reality that one may act with two or more purposes. It does not now appear that any issue of admissibility of evidence (*see infra*, Part II.B.4.) or the scope of any obligation of disclosure (*see infra*, Part III–IV) will depend upon which way this substantive law issue is finally resolved.

### 3. The Offense of Conspiracy to Obstruct Justice

As noted above in Part II.B.1., it is convenient (and instructive) to treat separately in one's thinking, first, the elements of the offense of obstruction of justice and, second, the elements of the offense of the conspiracy to obstruct justice that is charged in this case. With the analysis of elements of the offense of obstruction of justice as background, I turn now to the elements of the conspiracy charged in this case. Again, I will initially summarize these elements in a phraseology commonly used in jury charges.

■ Conviction of a defendant of conspiracy to obstruct justice requires proof beyond reasonable doubt of three essential elements: (1) that the conspiracy to obstruct justice charged by the government did exist; (2) that the defendant knowingly and willfully became a member of that conspiracy; and (3) that one of the conspirators did some overt act to accomplish the object of the conspiracy.

The overt act need not be one of the "events" that constitutes an obstruction of justice. Nevertheless, the obstruction-of-justice-state-of-mind requirement applies as surely to an overt act that is not one of the charged "events" as to an overt act that is also one of those events. This conclusion flows from the fact that, to be an overt act, it must be something an actor did "to accomplish the object of the conspiracy"— that is, to contribute to bringing about one or another of the events that constitutes an obstruction of justice. One cannot do something "to accomplish" the object of a conspiracy to obstruct justice without having the obstruction-of-justice state of mind.

An illustration based on a simple charge of conspiracy to commit a break-in serves to clarify the point. Suppose the purchase of a chisel at a hardware store is charged as an overt act. A finding that the defendant purchased the chisel one day, with no thought of using it "to accomplish" the object of the conspiracy, and on the next day decided to use it to accomplish the object of the conspiracy would not satisfy the overt act requirement. *Cf. Cintolo*, 818 F.2d at 993. On the other hand, a finding that the defendant purchased the chisel with the two purposes of using it first for household repairs and second, thereafter, to accomplish the planned break-in could satisfy the overt act requirement. (I leave to future determination whether such a dual-purpose state of mind would satisfy the requirement even if in the defendant's mind the purpose for household repairs was predominant because the defendant was thinking at the

time of the purchase that he already had another implement that would serve the break-in purpose as well or, at least, almost as well.)

In the present case, the allegations of the "overt acts" in the indictment, referred to by the government during this trial, include the following paragraph of the Second Superseding Indictment:

On or about February 11, 1985, defendants ROBERT GREENBERG and LYNDON H. LAROUCHE discussed impeding the Boston grand jury investigation by making a "vicious personal attack on William Weld" who was then supervising the Boston credit card fraud investigation in his capacity as the United States Attorney for the District of Massachusetts and defendant ROBERT GREENBERG thereafter wrote in his notebook "LHL: vicious personal attack on William Weld".

Second Superseding Indictment, p. 30, paragraph 28.

The "event" in which two named defendants "discussed ... making a 'vicious personal attack on William Weld'" is not an "event" among those constituting an obstruction of justice. However, paragraph 28 alleges that the named defendants engaged in this event—this discussion—as a means of "impeding the Boston grand jury investigation." Thus the required state-of-mind, as well as an "event" charged to be an overt act, is alleged in paragraph 28.

### 4. Admissibility of Evidence

■ If the jury finds that the government has proved beyond reasonable doubt that one or more defendants engaged in an act of obstruction or an overt act in furtherance of the conspiracy, then the jury will be required to consider whether a defendant so engaged had a state of mind that satisfies the state-of-mind element of the obstruction offense. Because it is possible that a person who participated in such an act might have done so without having the obstruction-of-justice state of mind, any evidence proffered by defendants that would tend to make less likely a reasoned inference that the act was undertaken with the obstruction-of-justice state of mind is relevant evidence and, unless inadmissible for some other reason, is exculpatory in nature.

Evidence that would support an inference that a defendant acted at a particular time (for example, at the time of an alleged overt act) for a purpose other than a purpose to obstruct justice may be found by a factfinder to be entirely consistent with the government's evidence that the defendant acted also for a purpose of obstructing justice. That is, proof of the existence of one purpose does not necessarily rule out the existence of another purpose. The point remains, however, that to the extent that evidence of another purpose is perceived and credited by the factfinder, the inference that a purpose to obstruct justice was part of the defendant's state-of-mind at the time of the alleged overt act is less compelling. (This latter point would not be valid, however, if the other purpose inherently subsumed the obstruction purpose. This would be the case, for example, if defendants sought to introduce evidence that they acted to comply with the suggestion of someone they believed to be representing a government agency that wanted them to obstruct the grand jury investigation. That evidence would tend to make more compelling rather than less compelling a reasoned inference that defendants acted with a state of mind that included an obstruction-of-justice purpose.)

■ I therefore conclude that proffered evidence is relevant if it tends to support an inference that a defendant acted for the purpose of responding to what he or she believed to be a threat arising from a source outside the defendant entities (the FBI, for example) and not at all for a purpose of obstructing justice.

Defendants have characterized evidence they wish to present as evidence of "harassment" by government agencies. The relevance and admissibility of evidence depends, however, not upon a particular characterization but upon whether the evidence, if credited, would tend to rebut some factual contention the government relies upon or (expressed another way)

would tend to cause a factfinder, when considering evidence in a reasoned way, to be less likely to find that the government had met its burden of proof upon some element of an offense charged. It follows that evidence of some forms of "harassment" is admissible while evidence of other forms is not. For example, evidence that defendants believed that the FBI or another government agency had put pressure on contributors of entities associated with LaRouche to influence them to decline future support would be admissible, because it would tend to make less likely a reasoned inference that the act of encouraging the burning of contact cards was undertaken with an obstruction-of-justice state of mind.

At the same time, evidence of other forms of "harassment" would not be admissible. For example, evidence tending to show that the FBI, in fact, infiltrated entities associated with LaRouche but were never detected by NCLC members is not admissible, because it does not tend to make less likely a reasoned inference that any alleged act of obstruction or overt act in furtherance of the conspiracy was undertaken with an obstruction-of-justice state of mind. *Cf. infra* Part VII.B. Actions of which a defendant was unaware cannot affect his or her state of mind. An analogy to the law of self-defense makes this point clear. Evidence that the victim was prone to violence, *if unknown to the defendant*, would not be admissible to negate criminal intent.

It is with this understanding of relevance to the issues in this case that the court will examine issues regarding the definition and scope of the governmental obligations of disclosure of relevant materials under the various duties of disclosure.

In so holding, I have thus far ruled upon only one among several theories of relevance advanced by defendants—which include, as well, a theory that defendants believed they were acting upon instructions or requests of some governmental agency communicated through a person who represented that he was acting for or at the request of the agency and a theory of entrapment. Thus far, defendants have

failed to call attention to persuasive support in precedents for admissibility of evidence of "harassment" or "infiltration" (a) on the ground that it would tend to support a so-called "CIA defense" (discussed *infra* in Part IV) or, without more, (b) a defense of "entrapment" (that persons on whom defendants relied, while acting at the behest of some government agency, encouraged them to bring about some event among those constituting an act of obstruction or an overt act in furtherance of the conspiracy). Even if all such defense theories are flawed, however, evidence proffered by defendants both to support a flawed theory and as well to respond to the government's proof on the obstruction-of-justice-state-of-mind requirement would remain admissible to the extent that it is relevant and admissible for the latter purpose.

### III. Disclosure Requirements Dependent on Designation of a Person as a Witness

■ When the government calls a person as a witness in criminal proceedings, disclosure obligations not otherwise imposed on the government may arise. First, the Jencks Act imposes an obligation to disclose any "statement" of the witness, at the close of the direct examination if not earlier. Second, the fact that a person has been called as a witness affects the scope of the obligation to disclose exculpatory evidence in the government's possession because the definition of "exculpatory" includes evidence that would tend to impeach. *United States v. Ingraldi*, 793 F.2d 408, 411 (1st Cir.1986). In the present case, a third reason that identification of a person as a witness affects disclosure obligations is that counsel made an agreement under the terms of which the government must disclose specified information relating to its witnesses.

Although Ryan Quade Emerson had not been identified before trial as one of the government's intended witnesses, and his name was not on the list placed before the jury panel during voir dire in October, his name was added at a time in December. The government thereafter withdrew his

name and now declares that Emerson will not be called as a government witness, but defendants contend that obligations of disclosure of impeaching material and other information within the scope of the agreement among counsel attached immediately upon the listing of Emerson as an intended government witness. Defendants contend also that these obligations have been violated by both delayed disclosure of some information (302s and Inserts delivered to defense counsel in March, 1988) and continued refusal of the government to disclose other materials in its possession relating to Emerson.

■ The government has responded that because it has now determined that it will not call Emerson, its delay in disclosing some materials about him and refusal to disclose other information cannot be held to constitute a violation of its obligations under *Brady* to disclose exculpatory materials. Even if *Brady* is considered not to be directly in point, however, because it involved the withholding throughout trial of information about a witness who was called by the government; nevertheless, I conclude that at least the agreement for disclosure has been violated in this case, and that some precedents appear to support as well the defense argument that the government obligation to disclose evidence that tends to impeach an expected government witness attaches before the time the Jencks Act obligation arises, and at least in some circumstances even before the witness is called to the stand.

The government argues that no "violation" has occurred where the government fails to disclose impeaching evidence of a witness whom, in the end, it does not call, because at most the government's obligation is to avoid prejudice from nondisclosure and no prejudice results from failure to disclose evidence that might have impeached a witness who is not called. I conclude that this argument must be rejected. Even though the underlying rationale of the obligation of disclosure is to provide the benefit of evidence that might impeach the witness, defendants were entitled to have that evidence disclosed and then to

use it during the trial in any proper way, which might produce benefits during the trial beyond that of impeachment. Because there has been a violation, the court cannot, without access to the undisclosed evidence, determine what, if any, prejudice resulted and what, if any, sanction would be appropriate.

Thus, even if none of the withheld materials regarding Emerson comes within the scope of a disclosure obligation reasoned on grounds discussed in Part II of this Memorandum, materials regarding Emerson that the government was obligated to disclose—either by reason of a duty to disclose impeaching evidence or a duty (pursuant to the agreement among counsel) to disclose other evidence bearing upon Emerson's relationship to government agencies —must now be disclosed unless an agency of the government (other than those in the prosecutorial team in this case) asserts that the information, or part of it, is classified, in which event the court must proceed in accordance with the Classified Information Procedures Act, 18 U.S.C.App. §§ 1, *et seq.*

## IV. The "CIA Defense" and Related Issues

Defendants wish to cross-examine government witnesses, and to be free later in trial to call witnesses, to elicit evidence that defendants believed that they were being requested by or on behalf of the CIA to do various things to thwart the grand jury investigation to serve some compelling governmental interest. One of several factual theories advanced is that the CIA valued the political support of Lyndon LaRouche and persons and organizations associated with him in responding, for example, to efforts of CIA critics to curtail CIA activities, and that the CIA wished defendants to take steps to block any grand jury investigation that might lead to criminal proceedings that would impair the effectiveness of support the CIA would otherwise receive from defendants.

One of the legal theories of admissibility of such evidence advanced by the defendants is the so-called "CIA defense." In its most far-reaching form, the contention is

that as to any otherwise unlawful act of a defendant, the defendant is not subject to criminal responsibility if when acting the defendant believed in good faith that a person acting for the CIA, as agent or otherwise, had requested that the defendant so act.

■ I conclude that this defense contention lacks merit as a matter of law. No precedent supports a defense of the nature suggested. Among opinions called to the court's attention, the opinion most favorable to defendants is that of Judge Wilkey in *United States v. Barker*, 546 F.2d 940 (D.C.Cir.1976). Even that opinion, which in this respect was not joined in by either of the other two members of the panel, construed most favorably to defendants, went no farther than recognizing a defense based on reasonable reliance on apparent authority, upon a factual showing supporting both a reasonable belief in authority and a proffer of a legal theory upon which to base a reasonable belief that the person alleged to have such authority did possess such authority. *Id.* at 949; *United States v. Duggan*, 743 F.2d 59, 83–84 (2d Cir.1984) (so construing Judge Wilkey's opinion). The opinions of each of the other members of the panel in *Barker,* and all the opinions in the other cases cited thus far, have rejected the so-called CIA defense. *See, e.g., United States v. Rosenthal*, 793 F.2d 1214, 1235–37 (11th Cir.1986).

The foregoing precedents not only preclude a CIA defense based upon a defendant's *good-faith belief* that he or she had been requested to perform some act on behalf of a government agent with apparent authority but also preclude such a defense based upon even an *objectively reasonable belief.* As a matter of law, the reasonableness of a defendant's belief is irrelevant where the government agent relied upon lacks actual authority to authorize the act performed. "[A] defendant may only be exonerated on the basis of his reliance on real and not merely apparent authority." *Id.* at 1235. I conclude that the CIA lacked actual authority to authorize an act of obstruction of justice. The court in *Rosenthal* stated that the CIA did

not have authority to authorize conduct that would violate the federal narcotics laws, *see id.* at 1236, and no sound reason can be perceived for not extending this rule as well to a violation of the federal obstruction-of-justice statute.

## V. *Roviaro Informants*

■ Defendants have argued that the government violated its obligation under *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), and its progeny, to disclose to the defendants the identity of a government informant. *Roviaro* confirmed the availability of the "government's (or informant's) privilege," *see also Scher v. United States*, 305 U.S. 251, 254, 59 S.Ct. 174, 176, 83 L.Ed. 151 (1938), but held that the privilege was not absolute. *See United States v. Estrella*, 567 F.2d 1151, 1152 (1st Cir.1977). Specifically, *Roviaro* held: "Where the disclosure of an informant's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro*, 353 U.S. at 60–61, 77 S.Ct. at 627–28. The privilege usually is litigated in the context of a defendant's challenge to a search in which the government claims that the informant provided the basis for probable cause, *id.* at 61, 77 S.Ct. at 628; however, this is not the only circumstance in which the issue arises. The government's refusal to disclose an informant's identity where that information would be material and helpful amounts to a denial of due process.

■ I conclude, on the record before me, that the government has not violated its "obligation" under *Roviaro*. First, the case at bar has not presented a *Roviaro* issue because the government has not invoked the government's privilege in response to a defendant's request for disclosure of an informant's identity. Second, even if I assume that a *Roviaro* issue was squarely presented, defendants had all the information they were entitled to under *Roviaro*.

As noted above, *Roviaro* and its progeny define the scope of the government's privi-

lege. *Roviaro* does not explicitly create an obligation to turn over information that has not been requested; rather, it defines at what point the public interest in protecting the safety of informants and the flow of information must bow to the individual's right to prepare his defense. *See id.* at 62, 77 S.Ct. at 628. In each case I have found in which a *Roviaro* issue was addressed, defendants had directly requested (and the government had refused) disclosure of an informant's identity or address. *See, e.g., id.* at 55, 77 S.Ct. at 625; *Estrella,* 567 F.2d at 1152; *United States v. Tucker,* 552 F.2d 202, 207 (7th Cir.1977). Indeed, in *United States v. Casiano,* 440 F.2d 1203, 1205 (2d Cir.), *cert. denied,* 404 U.S. 836, 92 S.Ct. 123, 30 L.Ed.2d 68 (1971), the court distinguished the facts presented from *Roviaro* because defense counsel made only "a most perfunctory request for the informant's name." The record before me does not suggest that defendants requested Emerson's name or address, that the government refused such a request, or that the "government's privilege" was invoked.

Where *Roviaro* applies, the court will order disclosure if defendants establish "a real need." *Tucker,* 552 F.2d at 209. There is no "need" for disclosure where defendants know the name of the informant and are able to make contact with him. *Cf. Casiano,* 440 F.2d at 1205. Due process, as defined in *Roviaro,* demands only that defendants not be denied the ability to prepare a defense by the government's refusal to make available information necessary to make contact with a material witness. Defendants were not denied that ability with respect to Emerson.

Defendants' argument, in fact, is not that the government failed to disclose the name and address of Emerson. Rather, defendants' argument is that the government failed to disclose that Emerson *was* an informant. The government indeed may have had an obligation to disclose that fact (under *Brady,* for example). To the extent an obligation existed, however, it did not arise under *Roviaro.*

## VI. Extent and Method of Government's Obligations to Search for Materials on Subjects of Disclosure

With the possible exception of any obligation of disclosure pursuant to the agreement of counsel (depending on how the agreement is construed), all of the theories of obligation considered in Parts II–V of this Memorandum are potentially subject to limitations that will now be addressed. Stated another way, the point is that the issues considered in Parts II–V concerned the subjects of materials and their relationship to the substantive law governing the case. Here, in Part VI, I consider issues regarding (a) whether there are additional aspects of the subject-matter standard for determining the scope of duties of disclosure, (b) how far the government must extend its search for materials on relevant subjects in order to discharge its disclosure obligations, and (c) what methods, short of page-by-page reading of all files in an office, will satisfy government obligations.

### A. The Subject–Matter Standard Used in Defining Disclosure Obligations

The subject-matter standard of relevance used as one of the elements in determining admissibility need not necessarily be the same as the subject-matter standard used in defining a disclosure obligation. Defense counsel have argued for application of a broader standard that would include not only documents admissible in evidence but also inadmissible materials that, if defense counsel had access to them, might aid them as leads to admissible evidence. The government, on the other hand, argues for a narrower standard that weighs other important interests. Also, the government argues that the broad demands of defense contentions in this case would, if adopted by the court, require that government counsel cast themselves in the roles of defense investigators and strategists.

Except for precedents that may be construed as rejecting the defense argument for a duty to disclose leads as well as admissible evidence, and indeed imposing a requirement of something more than likelihood of relevance, *see United States v. Ehrlichman,* 546 F.2d at 930 n. 96, no

precedent directly considering and resolving the issues raised by conflicting contentions for applying to disclosure duties a broader or narrower subject-matter standard than admissibility in evidence has come to the court's attention. I conclude that, rather than attempting to formulate a general rule or principle responsive to these contentions, I should instead take these arguments into account as I resolve particular issues considered below, subject to one further condition. The condition is that presumptively the subject-matter definition that the court has defined for determining admissibility (in all respects other than a possible exclusion under Fed.R.Evid. 403) will be applied as well as the subject-matter standard for defining the disclosure obligation, unless a party seeking application of a broader or narrower standard has filed a submission showing cause on the basis of which the court has made a determination and entered an order.

### B. Extent of the Search

 Clearly the duty to search and produce extends to materials in the custody of the attorney(s) appearing for the government in the case on trial. It seems likely that the obligation extends as well to materials in the custody of a United States Attorney whose assistant or assistants are the counsel actively trying the case. How far beyond this does the obligation extend?

Defendants argue that the United States of America is a single entity and that all that is known to any agent or agency of that entity is charged to every other agency while acting for the government. Thus, they argue, the prosecutorial agents of the government in a criminal case (including the attorneys representing the government in this case) have a duty to search for and produce all materials on subjects within the scope of a disclosure obligation in whatever government office or agency these materials might be found.

No precedent called to the court's attention supports that sweeping claim. In another context, during pretrial proceedings in this case, I rejected a similarly sweeping claim that the agencies of the United States participating in bankruptcy proceedings against entities that are defendants in this case and the attorneys appearing for the United States in this case represent one and the same entity and therefore must be treated in the same way as a single attorney would be treated if he or she attempted to represent all of the government interests involved in both the bankruptcy proceeding and this criminal proceeding. *See United States v. The LaRouche Campaign,* 682 F.Supp. 627, 628–29 (D.Mass. 1987). The central fallacy of the argument is that it fails to take account of the fact that the government often acts in a representational capacity and, like an institution serving as trustee for each of many different trusts, its duty of confidentiality with respect to what it learns from one beneficiary may not only protect against any duty of disclosure but also positively forbid such disclosure.

The tentative view of the court at this time, reached without benefit of any submissions from counsel calling attention to any authoritative guidance, is that the court should require government counsel, in discharging its duty as to materials within the scope of relevant subjects, to extend their search, at least to some extent and by some method (as to which *see* Part IV.C. below), to an attempt to find materials on relevant subjects within (a) all files in the office of the United States Attorney in this district, (b) those files in other Department of Justice offices (including United States Attorney offices and FBI offices) that relate to any aspect of proceedings involving the defendants in this case either in this district or in any other district, and (c) those files relating in any way to this case that are maintained by any other government agency that has participated in or assisted in the investigation or prosecution of the charges that are the subject of this trial, or any related potential charges.

If defendants wish to move for an order requiring a search of any broader scope, they may file a motion together with a written submission showing supporting cause, both in law and in fact, for the broader scope requested.

## C. Methods of Search

I conclude that the government is not required to cause a reading of every page of every document within the government offices to which the search extends, in order to meet its disclosure obligations. Rather, the translation of the definition of duties of the government into sets of specific methods and steps of search depends in part upon how files are maintained, organized, and indexed, and what methods short of page-by-page reading are feasible means of locating relevant materials that may appear either in likely or in apparently unlikely places. Methods and steps that are feasible in relation to one set of files in one office may be quite different from those that are feasible in relation to another set of files, even in the same office, and more likely still in relation to sets of files in different offices.

## D. Standard for Guidance in Search

Absent some showing in precedent or principle for applying a different standard in relation to some aspect of the search the government is obligated to make, I conclude that the following two guidelines should be applied:

 First, the government must search at least as widely and diligently for exculpatory evidence as it has searched at any time, in relation to charges in the case on trial or any possibly related offenses, for evidence that might be used by the government. If, for example, the government attorneys and persons in any agency aiding in the investigation at any stage have extended their search for possibly inculpatory evidence to an office of another government agency, the search for exculpatory evidence must extend to that office and must be at least as thorough as was the search for inculpatory evidence.

Second, the government must also extend its search to other offices as to which, on the basis of information accessible to the government attorneys by a search in the offices to which the first guideline applies, it appears there is a reasonable likelihood that a search of reasonable scope by feasible methods would identify evidence within the legal definition of the subject matter scope of the duty of disclosure.

The methods of search that are required to meet these guidelines will vary, depending on the circumstances of the case.

Pursuant to understandings reached in oral hearing during March 1988, government counsel have initiated indices searches extending to government agencies outside the Department of Justice, aimed at determining what, if any, files are indexed to two or more names on a list of persons having various associations with this case as defendants, as witnesses, or in some other way. The court is awaiting final reports on these indices searches, and will hear the parties as to what, if any, further order should be issued by reason of the results of the indices searches.

## VII. Issues Regarding Lewis, Howard, and Tucker

Remaining for consideration are, first, the application of the rules and principles set forth in Parts II–V to the particulars of the controversy over materials regarding Lewis, Howard, and Tucker and, second, defense motions alleging misconduct of government counsel in relation to evidence regarding Lewis, Howard, and Tucker. I turn first to the latter motions.

## A. Misconduct of Government Counsel

 Defendants have moved for sanctions against the government on the ground that the government has knowingly used false testimony by making use of evidence in conflict with a known statement of Lewis that he was asked by the government to infiltrate entities and persons associated with Lyndon LaRouche. I find that this set of motions is without merit. One may know that a person had made such a claim and at the same time believe that his claim is false. No evidence has been called to the court's attention that would support a finding that government counsel have ever believed that Lewis, or Howard, or Tucker was in fact asked to infiltrate LaRouche organizations.

## B. Disclosures Regarding Lewis, Howard, and Tucker

 Because the government has never given any indication of an expectation of calling Lewis, or Howard, or Tucker as a witness, Part III of this Memorandum (concerning duties of disclosure of evidence tending to impeach a witness) does not apply to materials regarding Lewis, Howard, and Tucker.

The defendants have not proffered a satisfactory explanation as to how a claim of any one of them (even if supported by some admissible evidence that it was a truthful claim) that he was asked to infiltrate LaRouche organizations would be admissible on a theory of entrapment, or a so-called "CIA defense," or how it would make less compelling the inferences the government seeks to have the jury draw from evidence bearing upon the obstruction-of-justice-state-of-mind element of the conspiracy offense charged in the indictment. Absent a showing of relevance to some issue defined by the substantive law governing this case, I conclude that no duty of disclosure will have been established as to even those materials regarding Lewis, Howard, and Tucker that are within files to which the duty of search and disclosure extends under the principles stated in Part VI.

## VIII.

This Memorandum has addressed some issues necessarily considered by the court after rejecting contentions advanced respectively by the defense and the government. In some instances, these issues fall between the untenable opposing positions of the parties and have not been addressed by counsel. The court values the adversary presentations of counsel as a contribution to full examination of the issues and will therefore invite prompt written submissions proposing any modification of the rulings stated in this Memorandum.

## ORDER

For the reasons stated in the foregoing Memorandum, it is ORDERED:

(1) Defense oral and written motions for dismissal, or in the alternative other sanctions, on the ground of knowing use of false testimony are denied.

(2) Defense motions for dismissal, or in the alternative other sanctions, on the ground of *Roviaro* violations are denied.

(3) The government motions for in limine rulings on the obstruction-of-justice-state-of-mind standard and on the so-called CIA defense are allowed to the extent stated in the foregoing Memorandum.

(4) Written submissions seeking modification of any ruling stated in the foregoing Memorandum may be filed on or before April 14, 1988.