**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Richard HAUFF, Defendant-**
**Appellant.**

**No. 71–1165.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 13, 1972.

Decided Feb. 8, 1973.

Certiorari Denied May 21, 1973.
See 93 S.Ct. 2299.

---

7. 45 U.S.C. § 151 et seq.

Terence F. MacCarthy, Federal Defender Program, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., William T. Huyck and Robert A. Filpi, Assts. to the U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before KNOCH, Senior Circuit Judge, FAIRCHILD and PELL, Circuit Judges.

KNOCH, Senior Circuit Judge.

Defendant-appellant Richard Hauff has taken this appeal from his conviction in a jury trial on a four-count indictment charging violations of Title 18 U.S.C. § 1341 in his use of the mails on

four different occasions in the execution of a scheme to defraud Rudolph and Florence Velasquez. Defendant was sentenced to a term of three years on each count, to run concurrently.

Mr. Velasquez testified that when he met defendant in 1967, the defendant offered him employment as a window washer and that the two became friends. He said that defendant told him of a conversation with Mrs. Velasquez in which she had said she was going to divorce Mr. Velasquez. Defendant suggested forestalling that divorce by converting all assets into cash to be placed in a safety deposit box.

Mr. Velasquez said he acted on this suggestion. He sold his and his wife's interest in two mutual funds and in an apartment building, cashing checks or depositing the proceeds in his savings accounts from which he made a series of withdrawals.

He described the general procedure as follows: in the company of the defendant, Mr. Velasquez would cash the checks given in payment for assets liquidated or withdraw several thousand dollars, usually in denominations of $50 or $100. About $51,000 was secured in this fashion in the course of time. He would count it and place it on the counter. The defendant would then pick it up and in nearly each instance put it into an envelope which he placed in his own coat pocket. On arrival at the safety deposit company, Mr. Velasquez would sign the access slip, but both men would go into the vault area. Defendant would drop an envelope into the safety deposit box or hand one to Mr. Velasquez to put into the box.

The safety deposit access slips were government exhibits at the trial. Bank tellers and a vault attendant testified to defendant's presence with Mr. Velasquez at the withdrawals of cash and the access to the vault. A thumbprint on the flap of one envelope found in the box was identified as defendant's.

When Mr. Velasquez later visited the box alone on October 24, 1968, he testified that of the nine envelopes he found there, none contained bills of a higher denomination than $1.00. He returned the same afternoon with his wife who testified that some of the envelopes contained paper cut up like money.

On the advice of his lawyer, Mr. Velasquez informed the United States Attorney's office, and with Postal Inspector Ostby again visited the box on October 31, 1968. Inspector Ostby testified to finding nine envelopes which contained altogether 304 $1.00 bills.

On October 29, 1968, when Mr. Velasquez discussed the contents of the box with defendant, they had agreed that the box contained at least $51,000. At that time defendant urged Mr. Velasquez not to visit the box without him. Later, on November 4, 1968, when told about the missing money, defendant told Mr. Velasquez that the money was all safe but refused to discuss the disposition of the envelopes. The next day he advised Mr. Velasquez that they were partners in a business deal and promised to advance $30,000 for the Velasquez children.

During these three conversations Mr. Velasquez carried a transmitter. Transcripts were made and tendered to the defendant prior to trial. The government states that these were held inadmissible under the decision in United States v. White, 7 Cir., 1970, 405 F.2d 838, subsequently reversed, 1971, 401 U. S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453. In oral argument in this court, counsel for the defendant, however, asserted that the material would have been inadmissible in any event because it was incoherent and inaccurate.

After his plea of not guilty, entered August 8, 1969, defendant was granted twenty days to file motions. On September 12, 1969, he filed his notice of Request for Pretrial Discovery, employing the wording of Local Criminal Rule 2.04(a) of the Northern District of Illi-

nois, reading in pertinent part as follows:

(1) Permit defendant's attorney to inspect and copy or photograph any relevant written or recorded statements or confessions made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government;

(2) Permit defendant's attorney to inspect and copy or photograph any relevant results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the case, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the government;

(3) Permit defendant's attorney to inspect and copy or photograph any relevant recorded testimony of the defendant before a grand jury; [It does not appear that defendant ever appeared before a grand jury in this case.]

(4) Permit defendant's attorney to inspect and copy or photograph books, papers, documents, tangible objects, buildings or places which is the property of the defendant and which are within the possession, custody or control of the government;

(5) Permit defendant's attorney to inspect and copy or photograph the Federal Bureau of Investigation Identification Sheet indicating defendant's prior criminal record;

(6) Permit defendant's attorney to inspect, copy or photograph any evidence favorable to the defendant;

Material provided in response on November 4, 1969, included copies of the nine envelopes found in the safety deposit box, on two of which were a scrawled signature "Richard Rossi."

Copy of an Examination Report made December 11, 1968 by Assistant Director James F. Lynn of the Post Office's Identification Laboratory, was also provided. That report concerned fingerprint examination of the envelopes. Nothing was said about analysis of the handwriting.

■■ At the trial, during the government's case in chief, Mr. Velasquez said that he saw defendant sign the name "Richard Rossi" on the two envelopes mentioned. During the defendant's case in chief, the government tendered a copy of a report made by James Lynn, although no expert witness respecting the signature had been offered by the government up to that time. Defense counsel's motion for a mistrial for violation of Rule 16(a), Federal Rules of Criminal Procedure, by untimely delivery of this document, was denied. Rule 16(a) provides:

Upon motion of a defendant the court may order the attorney for the government to permit the defendant to inspect and copy or photograph any relevant . . .

(2) results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, . . . .

The defense later produced Philip Vivian as an expert handwriting analyst who concluded from his comparison of the two envelopes with samples of defendant's writing that it was not defendant who. had written the name on one of the two envelopes. He had no opinion "with reasonable certainty" as to the other.

The government then called James Lynn, who had already testified as an expert on fingerprint comparison. He said (without cross-examination) that

the evidence was not sufficient to substantiate a demonstration, and that the over-all evidence was inconclusive. He did express the opinion that Mr. Velasquez had not written the signatures. He also said one could successfully disguise his handwriting and (unlike Mr. Vivian) he considered the fact that no writing was performed in a hasty and scrawled manner was a factor in making identification.

Defendant contends that mistrial should have been granted after the government had withheld until October 6, 1970, a report dated November 17, 1969, which was favorable to the defense in that Mr. Lynn's analysis of the handwriting was inconclusive, thus providing no corroboratory support for Mr. Velasquez's testimony that he saw these two signatures affixed by the defendant. Defendant argues that he was prejudiced as he was precluded from using this report in preparation of his defense and in the early portions of the trial, such as the opening statement to the jury, or in cross-examination. He contends that the report fell within the class of documents sought by his pretrial request and that the prosecution was obligated to disclose it under Brady v. Maryland, 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. Further he considers it a relevant scientific test made in connection with the case which was called for by Rule 16(a)(2) and Local Criminal Rule 2.04(a)(2) and (6).

Defendant suggests that had the existence of the report been made known earlier, he might have resolved its inconclusiveness by providing further examples of defendant's handwriting. It does not appear from Mr. Lynn's report, however, that his difficulty lay in a lack of admitted handwriting samples but in the nature of the two scrawled questioned signatures. Defendant also argues that the mere fact of defendant's willingness to co-operate could have been shown to establish his own faith in his innocence.

We cannot agree that an inconclusive report by an expert would have been useful in impeaching Mr. Velasquez, or that defendant's offers to help (if admissible) in a manner which would clearly not have been helpful would bolster his assertions of innocence.

As indicated, the request was filed September 12, 1969. A discovery conference was held on November 4, 1969, at which defendant notes that the existence of the handwriting report was not disclosed. The report, however, is dated November 17, 1969. Extensive and liberal discovery was made by the government. In view of the inconclusive nature of the later dated report, it is not surprising that it was overlooked.

The government takes issue with defendant's classification of the report as favorable to the defense. The report states "that while the person who executed the known 'Richard Hauff' signatures [defendant] may in all probability be responsible for the execution of the two 'Richard Rossie' signatures, . . . clear and demonstrable handwriting evidence sufficient to warrant and support identification is not present."

In his testimony, Mr. Lynn said that the signatures provided a minimum of evidentiary data. He explained that the pen strokes were disturbed by the contents of the envelopes over which the signatures were made.

Unlike the situations in the cases on which defendant relies, this report was not exculpatory, but merely not inculpatory. We cannot agree with the District Judge's description of it as "favorable."

In *Brady* a co-defendant's statement in which he admitted firing the fatal shot was withheld. In United States v. Poole, 7 Cir., 1967, 379 F.2d 645, 647, on which defendant also relies, after the jury had returned its verdict, defense counsel learned of a physician's report that his examination of the alleged rape victim disclosed no evidence of the girl's having had sexual intercourse. United States ex rel. Raymond v. Illinois, 7 Cir., 1971, 455 F.2d 62, 66, involved a report

that examination of the clothing of an alleged rapist disclosed no sperm. In Barbee v. Warden, Maryland Penitentiary, 4 Cir., 1964, 331 F.2d 842, 845, defendant's revolver was produced in the course of the trial and witnesses interrogated about it. Undisclosed was a report of a ballistics test in which an expert stated the opinion that this was not the weapon used in the shooting. Here the report merely evaluated the evidence as insufficient for conclusive analysis.

It is significant that the government produced Mr. Lynn as an expert on handwriting only in rebuttal to contradict the defendant's expert who had claimed that the evidence was sufficient to enable him to negative one of the signatures as definitely not that of the defendant and who expressed the view that attempts to disguise and scrawls were not factors affecting identification.

Copies of the physical evidence itself (the envelopes) were in the possession of the defense long before trial. Even the inconclusive report was presented before the defendant put on his own expert. The report was received in time for defendant to consult his own expert and to decide whether to call him. He was able to invite the attention of the jury in closing argument to the absence of any expert corroboration of Mr. Velasquez's assertion that he saw defendant sign the envelopes.

We are not dealing here with a deliberate suppression of evidence. In complying with defendant's pretrial request, justly characterized by the government as "boiler plate" in the exact terms of the Rule, the government was not easily able to anticipate what might prove helpful unaided by any specific requests after receipt of copies of the envelopes, as in *Brady* where the defense asked for all statements made by the codefendant. There was no "flagging" of the importance of the evidence for the defense. See United States v. Keogh, 2 Cir., 1968, 391 F.2d 138, 147–148. As the District Judge said, however, the better practice is to resolve doubts in favor of the defendant.

At worst here, harmless error occurred. The report which was not exculpatory in nature was in the hands of the defense when it became relevant to contradict the view of the defendant's expert before he was called. Defendant was not deprived of a fair trial by the delay in its production.

Although he believed that the report was an item favorable to the defendant, the District Judge in ruling on the motion for mistrial exercised the discretion reposed in him by Rule 16(g), Federal Rules of Criminal Procedure, when he denied mistrial. The Rule imposes a continuing duty to disclose and provides that where it is brought to the attention of the Court that a party has failed to comply,

> [T]he court may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems just under the circumstances.

See United States v. Allsenberrie, 7 Cir., 1970, 424 F.2d 1209, 1215.

On September 12, 1969, defendant's pretrial discovery request also sought indication whether or not electronic surveillance was conducted of any conversations at which defendant was present, listing four specific premises in which defendant alleged a proprietary interest. An identical request was made on December 10, 1969. The government notes that both of these requests were filed beyond the 20-day period granted at arraignment on August 8, 1969. The government answered stating that defendant had already been informed of surveillance of his conversations with Mr. Velasquez and that defense counsel would be allowed to hear the tapes and to receive copies of the transcripts, which were in fact delivered. The answer included the information that a

statement was being requested from the Department of Justice which would be disclosed in a supplemental answer.

The record contains three statements from Department of Justice officials, all denying knowledge of electronic monitoring by the Department of Justice or the Internal Revenue Service. The term used in the first letter is "unlawful electronic surveillance." The second letter omits the word "unlawful" and refers to the four specific locations of the request plus one other. The third letter is a "clarification" and states that the Department specifically excludes from its denials any surveillance conducted by kel-set where consent of a party to the conversation was obtained.

■ On appeal, defendant now attacks "the letter" (evidently the first one) as insufficient to meet the government's obligation under Alderman v. United States, 1969, 394 U.S. 165, 89 S. Ct. 961, 22 L.Ed.2d 176. Defendant argues that a letter from the Attorney General's office denying any "unlawful" electronic surveillance is insufficient in that the prosecutor should not himself decide whether the surveillance was unlawful and, further, that the government's indexing is insufficient in that the letter failed to acknowledge monitoring by the Internal Revenue Service which was admitted in two other cases against this defendant and conversation monitoring in this case, results of which were made available by the United States Attorney's office.

As indicated, the latest statement expressly excluded from the denial any kel-set monitoring. The records of the cases to which defendant refers show that the monitoring there was also by kel-set with the consent of one party to the conversation.

The judgment of the District Court is affirmed.

Affirmed.

\* Rule 18, 5 Cir.; *see* Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al., 5 Cir., 1970, 431 F.2d 409, Part I.