UNITED STATES of America

v.

John M. POINDEXTER.

Crim. No. 88–0080–01 (HHG).

United States District Court,
District of Columbia.

Sept. 11, 1989.

Lawrence E. Walsh, Independent Counsel, Dan K. Webb, Louise R. Radin, Christian J. Mixter and Howard Pearl, Associate Counsel, Office of the Independent Counsel, Washington, D.C., for the U.S., plaintiff.

Richard W. Beckler, Joseph T. Small, Jr., Stephen M. McNabb, Frederick Robinson and Michael G. McGovern, Fulbright & Jaworski, Washington, D.C., for John M. Poindexter, defendant.

## OPINION

HAROLD H. GREENE, District Judge.

Pending before the Court are a number of questions regarding the discovery to which defendant is entitled from the government. The parties have filed voluminous briefs and supporting documents; the Court has heard oral argument; and the issues are ripe for disposition.

### I

### Introduction

This case was transferred to this Court on June 2, 1989. Defendant filed an ex parte motion to compel classified discovery two days later, and his motion regarding unclassified discovery was already pending. At a status conference held on June 16, 1989, and in its Order dated June 21, 1989, the Court stated that such motions were premature. It directed the parties to engage in negotiations concerning the scope of discovery and to file motions only regarding those areas of discovery as to which no agreement could be reached. The negotiation period is now over, and defendant has filed new discovery motions which are considered below.

Based on the motions and the government's [1] response, it appears that the negotiations were fruitful. The parties reached agreement on over 100 specific requests made by defendant. The government has stated, without contradiction, that it has already produced over 300,000 pages of documents,[2] and it is prepared to produce roughly 100,000 additional pages of documents once the issue concerning the form of production is resolved. See Part VI *infra*. What essentially remains in the wake of the production of this large volume of material are various disputes regarding the impact of the narrowed indictment on discovery, the scope of relevant discovery, and several specific disagreements as to the manner of production of documents.

At this relatively early stage of the litigation, and in a matter as complex as this

---

1. The parties have adopted different nomenclatures to refer to the entity prosecuting this case. Except where this might be confusing, (*e.g.*, Part III–B *infra*), the Court will refer to the prosecuting authorities as the government.

2. Many of these documents were produced prior to the recent negotiations between the parties. The government asserts that various defense and intelligence-related agencies, as well as the Departments of State and Justice and the White House have given the Independent Counsel, who has in turn produced to the defendant, virtually all documents dated between January 1, 1984 and December 31, 1986, in the following categories:

1) United States government support of the Contras, including direct support and and efforts to obtain support from other countries;
2) Private Support for the Contras;
3) The Iranian Initiative, including:
 (a) United States government sales of arms to Iran;
 (b) Israeli government transfers of arms of United States origin to Iran conducted with United States government approval or of which the United States government was aware;
 (c) The defendant's contacts with Iranian officials or representatives or agents of the Iranian government or elements in Iran;
 (d) Other United States government representatives' contacts with Iranian officials or representatives or agents of the Iranian government or elements of Iran;
 (e) Related efforts to obtain the release of United States hostages in Iran;
 (f) Use of funds generated by the sale of arms to Iran;
4) Congressional Inquiries concerning Categories 1, 2, and 3;
5) Activities following the disclosure of the sale of arms to Iran, including the Attorney General's inquiry and activities of the defendants regarding categories 1, 2, 3 and 4.

The government has also produced to defendant the documents requested by Oliver North in his Supplemental Second CIPA notice, even though that notice was stricken by Judge Gesell as grossly overbroad. Government Opposition at 6 n. 2.

case, it is difficult to determine what may or may not be relevant or, in the language of Rule 16, "material to the preparation of the defendant's defense." Fed.R.Crim.P. 16(a)(1)(C). The language and the spirit of the Rule are designed to provide to a criminal defendant, in the interest of fairness, the widest possible opportunity to inspect and receive such materials in the possession of the government as may aid him in presenting his side of the case. Moreover, because of the CIPA process [3], the Court will have an opportunity to address once again the issue of the materiality of classified documents that have been produced and their use as evidence. For these reasons, as will be seen below, the Court has been inclined to err on the side of granting discovery to the defendant of matters that may fairly be encompassed within the indictment,[4] and it has generally resolved close or difficult issues in his favor.[5]

Notwithstanding the Court's liberality with regard to defendant's discovery requests, some requests are of such tangential relevance that, given the potential burdensomeness to the government of producing the documents, the motion to compel as to them must be denied.

## II

### *Legality of the NSC Activities*

The defendant requests the production of numerous categories of documents, including documents evidencing not only the Iran–Contra activities of the National Security Council staff (NSC) but also those which describe other activities or indicate the extent of the knowledge of the NSC activities by various government officials. The defendant argues that such documents would evidence the legality of and authorization for the NSC activities and thereby demonstrate that he had no motive to enter into an agreement to conceal those activities from Congress. The government counters that the amended indictment charges very narrow offenses which in no way implicate the legality of support for the Contras or that of the use of funds from Iranian arms sales.

In order to analyze these issues, it is important to understand precisely what is charged by the amended indictment. Count One alleges that the defendant entered into a conspiracy with Oliver North and others to conceal the NSC's Iran–Contra activities by obstructing a congressional inquiry, making false statements, and destroying documents. Counts Two through Five contain corresponding substantive charges of obstruction and false statements.

The first object of the alleged conspiracy is the obstruction of inquiries by Congress as alleged in Counts Two and Three of indictment. Count Two, in turn, is a substantive charge of obstructing Congress: it charges that Poindexter sent letters that contained allegedly false statements, and that he commended North for having made allegedly false statements in a meeting with congressional members. According to the government, the letters at issue, submitted by Poindexter in response to a proposed resolution of inquiry into the activities of the NSC, make reference to letters sent to Congress in 1985 in response to similar inquiries. The second count alleges that Poindexter's letters to Congress were false because he knew that the referenced 1985 letters contained false statements.

The allegedly false statements contained in the 1985 letters, and incorporated by

---

3. The Classified Information Procedures Act (CIPA), 18 U.S.C.App. IV § 4, sets up a procedure for dealing with classified materials in the context of criminal litigation.

4. That is so particularly since this defendant, unlike the defendant in such cases as *United States v. Yunis*, 867 F.2d 617 (D.C.Cir.1989), had high security clearances, and production of sensitive information would be less likely to harm national security interests. But see, note 22 *infra*.

5. The decisions made herein with respect to such discovery should obviously not be regarded as rulings that the documents so produced are necessarily material or otherwise admissible evidence at trial. Determinations in that regard will be made at a later time, either in connection with the review required by CIPA or at the trial itself (when decisions will be governed by the Federal Rules of Evidence).

reference in the Poindexter letters, were specific, as follows:

> We did not solicit funds or other support for military or paramilitary activities either from Americans or third parties. We did not offer tactical advice for the conduct of their military activities or their organization. Count Five of the Original Indictment at ¶ 4.[6]
>
> None of us has solicited funds, facilitated contacts for prospective potential donors, or otherwise organized or coordinated the military or paramilitary efforts of the resistance. Count Six of the Original Indictment at ¶ 4.
>
> Mr. Chairman, like you, I am most concerned that at a time when humanitarian assistance is being extended to the UNO there be no misgivings as to the existence of any parallel efforts to provide, directly or indirectly, support for military or paramilitary activities in Nicaragua. There has not been, nor will there be, any such activities by the NSC staff. Id. Lieutenant Colonel North did not use his influence to facilitate the movement of supplies to the resistance. Count Seven of the Original Indictment at ¶ 4.
>
> Q. Has Colonel North been the focal point within the NSC staff for handling contacts with private fund raising groups, such as the World Anti–Communist League and the Council for World Freedom headed by retired Major General John K. Singlaub?
>
> A. No. Id.
>
> There is no official or unofficial relationship with any member of the NSC staff regarding fund raising for the Nicaraguan democratic opposition. This includes the alleged relationship with General Singlaub. Id.
>
> Q. The Nicaraguan freedom fighters, in the last two months, are reported by the U.S. Embassy, Tegucigalpa, to have received a large influx of funds and equipment with some estimates of their value reaching as high as $10 million or more. Do you know where they have obtained this assistance.
>
> A. No. Id.

In addition, Count Two alleges that Poindexter sent a message to North which stated "Well done" after North met with Members of Congress and made false statements which allegedly Poindexter also knew to be false. Again, the allegedly false statements are specific, as follows:

> North had not given military advice to the Contras, had no knowledge of any specific military action conducted by the Contras, had not had contact with John K. Singlaub for the previous twenty months, had not raised funds in support of the Contras, had not advised or guided Robert W. Owen with respect to the Contras, and had only casual contact with Owen.

Finally, the indictment charges in another count obstruction of Congress (Count Three) and two counts of making false statements (Counts Four and Five),[7] all in connection with an allegedly false chronology regarding the government's knowledge of and involvement in the sale of arms to Iran. These counts rest on the allegation that Poindexter lied about the time when he and others in the government learned about the sale of Hawk missiles to Iran.

■ Narrowly construed, it would not appear necessary for the government to show, nor apparently does the government intend to show, that any of the activities that were the subject of the allegedly false statements were illegal. If Poindexter knew, for example, that North had solicited funds for the contras or had given them military advice, yet stated to the Congress that such activities had not occurred, it would be immaterial whether those activi-

---

**6.** These specific allegedly false statements, contained in 1985 letters sent by then National Security Advisor Robert McFarlane and allegedly authored by North, were quoted in Counts Five through Seven of the original indictment. Although these counts are no longer in the current indictment, the letters themselves and the statements contained therein are still at issue because they are the false statements referenced in Count Two of the indictment now before the Court.

**7.** Count One charges that another object of the conspiracy was to make false statements as alleged in Counts Four and Five.

ties were legal or illegal. It would be enough that the statements were false, were known to be false, were material, and were made to Congress. See *United States v. Washington,* 705 F.2d 489 (D.C. Cir.1983); *United States v. Silverman,* 745 F.2d 1386, 1396 (11th Cir.1984). Similar reasoning applies to the other charges.

The Court has considered such a narrow reading—which would serve to defeat the vast bulk of defendant's discovery requests since these requests relate primarily to the question of the legality of the Iran–Contra activities—but has decided to reject it, for the following reasons.

In order to prevail on Count One, the government must prove—and defendant must therefore be entitled to disprove—a specific intent to enter into an agreement to lie to Congress, to destroy documents, and to obstruct a congressional inquiry. With respect to Counts Two and Three, the obstruction of congressional inquiry charges, the government must similarly show that the defendant acted with the specific intent corruptly to impede or to endeavor to impede a congressional inquiry.

It is defendant's basic contention that, whatever may be the materiality of the legality vel non of the activities of the NSC staff to the charges of lying to the Congress, destroying documents, and obstruction, what is clearly material is his belief in their legality: if he believed in their legality, he would have had no motive to conceal these activities. By that reasoning, absence of a motive would, in turn, refute the claim that he intentionally entered into an agreement,[8] the purpose of which was to conceal these activities from the Congress by various means.[9]

Evidence regarding the absence of motive is usually admitted to negate specific intent. *United States v. Whitman,* 771 F.2d 1348, 1350–51 (9th Cir.1985); *United States v. Richmond,* 700 F.2d 1183, 1195 (8th Cir.1983). See generally, *United States v. U.S. Gypsum,* 438 U.S. 422, 444 n. 20, 98 S.Ct. 2864, 2877 n. 20, 57 L.Ed.2d 854 (1978); *United States v. Day,* 591 F.2d 861, 874–75 (D.C.Cir.1978). Defendant claims, and the Court concurs, that there is the implication in Count One that the purpose of the conspiracy was to conceal the Iran–Contra enterprise from Congress because the NSC activities were illegal, unauthorized, and, more specifically, in violation of the Boland Amendment. See note 10 *infra.*

Therefore, the Court requires documents to be produced, as explained below, where they directly support defendant's "no motive to conceal" theory, that is, the theory that he had no such motive because he reasonably believed that the NSC activities were lawful, or its equivalent, that they were widely known throughout the govern-

---

8. Count Two also contains quotes from Poindexter's letter which not only reference the 1985 letters but also state that the actions of the NSC "were in compliance with both the spirit and letter of the law regarding support of the Nicaraguan resistance," and that the NSC has been and continues to be "within the spirit and the letter of the law." Count Two goes on to allege that "Poindexter then and there well knew and believed, among other things, that the 1985 letters and submissions were false and could not have been a truthful response to the 1986 inquiries." This language could be read to suggest that Poindexter also knew and believed that his general statement that the NSC's activities complied with the letter and spirit of the law was false. On that basis, defendant argues that Count Two of the indictment provides justification for the production of documents that would support his reasonable belief of the legality of his actions. Defendant argues that his statements regarding the letters and the spirit of the law were not false because the NSC was, or Poindexter reasonably believed that the NSC was, in compliance with the law.

*The government responds that the allegedly false statements are the specific statements made in the 1985 letters referenced by the Poindexter letters.*

The Court need not resolve this dispute because, to the extent that it is providing discovery of documents under Rule 16(a)(1)(C), it is on the basis of the defendant's contention that these documents are material to the question of motive and specific intent to enter an agreement to conceal.

9. The government argues that defendant may have had several motives for concealing his activities even if he believed them to be lawful. Opposition at 13 n. 7. That may be, but it does not negate defendant's right to the discovery of documents that will support his version of the events.

ment, including the Congress. However, where requested categories of documents deal with events or activities that are remote from or unrelated to the specific charges, discovery will not be compelled, as the conceivable relevance of these documents even to the question of motive or legality is too attenuated.

### III

The Court now turns to the question of what types of documents requested by the defendant may be material to a showing of his belief in the legality of the activities.

### A. *Applicability of the Boland Amendment*

■ While defendant is not charged with violating the Boland Amendment[10], the indictment suggests that he and others conspired to lie to Congress in order to conceal activities of the NSC that were contrary to the provisions of that statute. Defendant maintains that the Boland Amendment did not apply to the NSC and that its activities were therefore legal, or that he believed in the nonapplication of the statute to the NSC and hence in the legality of these activities. Accordingly, says the defen-

dant, there was no reason to conspire to conceal them. On that basis, he seeks all documents prepared by the Executive Branch regarding the applicability of the Boland Amendment to the NSC. The Court will require such production.[11]

If there are documents supporting defendant's belief that the Amendment did not restrict the NSC, or indicating that Executive Branch officials and members of the NSC concluded that the Boland Amendment did not apply to NSC activities, this could support his belief in the legality of those activities, and hence negate his specific intent to violate the law. The Court is accordingly persuaded that, on that basis, the defendant is entitled to discovery of these documents, and it hereby directs the government to produce them.[12]

### B. *Knowledge of NSC Iran–Contra Activities by the President and Other Government Officials*

■ The Court is also persuaded that defendant is entitled to discover documents regarding the knowledge of other high government officials of the NSC's Iran–Contra activities, their authorization thereof, or their participation therein.[13] Such

---

**10.** The Boland Amendment, enacted as part of Public Law 98–473 on October 12, 1984, prohibited certain government agencies and entities from expending funds to support the military or paramilitary operations of the Contras. Specifically, it provided as follows:

During fiscal year 1985, no funds available to the Central Intelligence Agency, the Department of Defense, or any other agency or entity of the United States involved in intelligence activities may be obligated or expended for the purpose or which would have the effect of supporting, directly or indirectly, military or paramilitary operations in Nicaragua by any nation, group, organization, movement, or individual.

The Boland Amendment was modified twice, with the effect that agencies and entities of the United States involved in intelligence activities were at all times between October 12, 1984 and October 17, 1986 prohibited from spending funds to support the military or paramilitary activities of the Contras. See Count One, paragraphs 4–5 of the indictment.

**11.** With respect to a number of subjects, including this one, the government claims that it either has made production or is prepared to produce, but defendant asks for, and he is entitled, to a court order which will fix his right

which is otherwise dependent upon government decision and interpretation.

**12.** Defendant also seeks to compel the production of documents concerning the applicability of or compliance with Executive Order 12333 and National Security Decision Directive 159, which govern covert operations on a general basis. Before it was amended, the indictment suggested that the NSC's Iran–Contra activities had not been approved as required by these provisions. *See* Count One of the original indictment. This, then, would have been another possible motive for intentionally concealing these activities from Congress. These provisions, however, are no longer a part of the indictment. There is no suggestion in the amended indictment that the alleged conspiracy was in any way connected or concerned with these provisions. Compliance or noncompliance therewith is no longer an issue of sufficient relevance to require the production of documents regarding EO 12333 or NSDD 159.

**13.** While agreeing in principle that such documents should be produced, certain of defendant's specific requests in this area are so overbroad or so tangential to the issue of knowledge

evidence may be material to a defense of lack of specific intent for several reasons.

First, documents indicating that United States officials, including Members of Congress and congressional staff, knew of the activities of this defendant and those of Oliver North, might provide support for defendant's assertion that he did not attempt to conceal the NSC's activities. Furthermore, such documents might support his claim that he had no motive to conceal these activities since they were already widely known. Finally, proof that the activities were known by many in government could help defendant's claim that he reasonably believed them to be legal. Such documents must accordingly be produced to the defendant.

These conclusions apply with equal force to documents, if any, regarding knowledge of or participation in the NSC's Iran–Contra activities by former President Reagan and then Vice President Bush. Documents evidencing Presidential authorization, if any, of these activities would also be material to support Poindexter's claim that he reasonably believed the NSC's activities to be legal, and that he therefore had no motive to conspire to lie about them.

Defendant has specifically requested such documents, including particularly the relevant notes or diaries created or maintained by the former President and Vice President. Although the Independent Counsel has agreed to produce any such documents that are in his possession, he claims that he has no obligation to go beyond that, on the following basis.

■ Rule 16(a)(1)(C), requires only the production of documents in the hands of the prosecutor, any investigative unit under the prosecutor's control, and any other federal agency allied with the prosecution or involved in the prosecution of criminal litigation. *United States v. Haldeman,* 559 F.2d 31, 73–74 (D.C.Cir.1976). According to the Independent Counsel, much of the information sought is in the possession of former President Reagan, the Archivist

of the United States, or President Bush, and therefore because

> ... neither the former or current President, nor any archive or presidential library that may presently have custody of presidential materials, is an agency of government allied with the prosecution for purposes for [sic] Rule 16 ... the Independent Counsel has no obligation to secure and produce Presidential or Vice Presidential diaries or notes. Opposition at 54–55.

The question remains, however, as to what constitutes an "agency allied with the prosecution ..." in a case such as this. In *Haldeman,* Watergate defendant Ehrlichman asserted that the special prosecutor was constitutionally required to produce all favorable evidence in his possession or in the possession of any branch of the federal government. Of this argument, the Court of Appeals said only that "[i]n the circumstances of the record, we need not pass on a proposition so broad...." 559 F.2d at 73. The court went on to note that

> The pivotal question, as will develop, is that Ehrlichman does not indicate how any possibly inaccessible information might have been material to his defense.

559 F.2d at 73. Thus, the question of how far the prosecutor's obligation of production extends was simply not decided by the Court of Appeals.

Other courts have made it clear, however, that the government cannot be compartmentalized for purposes of Rule 16 as readily as the Independent Counsel suggests. Courts have in the main been more concerned with fairness to the defendant, on the one hand, and the government's ease of access to the documents sought, on the other, than with the issue whether the documents are actually within the physical possession of the prosecutor. For example, the court in *Haldeman* itself distinguished that case from *United States v. Deutsch,* 475 F.2d 55 (5th Cir.1973), in which the defendant did demonstrate the materiality of the evidence sought. There, defendants charged with bribing a Post Office employee sought production of the

of NSC's activities that they will be denied, as

reflected in the accompanying Order.

employee's personnel file. The District Court denied the motion because the file was not in the possession of the prosecutor. The Court of Appeals reversed, stating:

> The government cannot compartmentalize the Department of Justice and permit it to bring a charge affecting a government employee in the Post Office and use him as its principal witness, but deny access to Post Office files....

475 F.2d at 57. Although that case and this differ in a number of ways, they are alike in one significant respect: in both, the criminal defendant sought documents from the agency of his or his co-conspirator's employment—there the Post Office, here the White House.

More importantly, several courts have noted that a prosecutor who has had access to documents in other agencies in the course of his investigation cannot avoid his discovery obligations by selectively leaving the materials with the agency once he has reviewed them. Specifically, in *United States v. LaRouche*, 695 F.Supp. 1265, 1281 (D.Mass.1988), the court held that when the government's investigation has extended

> to an office of another government agency, the search for exculpatory evidence must extend to that office and must be at least as thorough as was the search for inculpatory evidence.

Similarly, the Court of Appeals for the Fifth Circuit has noted that the prosecutor

> would not be allowed to avoid disclosure of evidence by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial.

*United States v. Trevino*, 556 F.2d 1265, 1272 (5th Cir.1977).[14]

In this case, the Independent Counsel has had access in the course of its investigation to extensive quantities of White House documents, including some documents held by the former President and Vice President. He has benefitted from the cooperation of the White House in this area, and he cannot now, in fairness, be permitted to disclaim all responsibility for obtaining Presidential documents that are material to the preparation of the defense.[15]

It remains to be determined, however, whether the documents sought are material to the preparation of the defense, for an affirmative answer is of course necessary to defendant's discovery rights. *Haldeman*, 559 F.2d at 73. Defendant has made some general representations in this regard. Certainly, as he has stated, he worked directly for the former President; he met with him on an almost daily basis; and the alleged violations occurred while he was so employed. Defendant also contends in somewhat conclusory fashion that the former President and Vice President knew of, and that the former President participated in the actions he took. If these claims are literally correct, the documents which would support them would be material to the preparation of Poindexter's defense and accordingly discoverable by him through the Independent Counsel under Rule 16.

Nevertheless, in a matter in which the former and the present Chief Executive and thus the heads of a branch coordinate with the Judiciary are involved, as well as such of their papers as their personal diaries and notes, the Court has a special obligation to act with prudence and restraint, and not to compel actions that may prove to be unnecessary or otherwise inappropriate. See *United States v. Nixon*, 418 U.S. 683, 715, 94 S.Ct. 3090, 3111, 41 L.Ed.2d 1039 (1973); *United States v. Burr*, 25 Fed Cas. 1, 192 (C.C.Va.1807) (No. 14,694); *Haldeman*, 559 F.2d at 76. Neither a President nor his papers are beyond the reach of the law that requires the production or the giving of evidence; and where a defendant in a criminal case needs that evidence, this Court will enforce his

---

**14.** There is no indication here that the Independent Counsel selectively sought only those White House documents that supported his case; he apparently took what was given to him. Nevertheless, the principle of *Trevino* applies.

**15.** But see, the issue of the Presidential Records Act of 1978, discussed at p. 1479 *infra*.

right to its production. See *United States v. Nixon*, 418 U.S. at 711, 94 S.Ct. at 3109. However, special care must be taken in that kind of a situation that compulsion not be employed lightly or frivolously but only in case of necessity. In pursuit of that obligation of prudence, the Court will require that two additional steps be taken prior to any decision with respect to the compulsion of production of these documents.

First, while, as indicated, the defendant claims that former President Reagan knew about, authorized, and participated in the challenged activities, and that then Vice President Bush also had knowledge of some of them, his assertions in that regard are sufficiently general and ambiguous that more specificity is called for. The Court will therefore avail itself of the offer made by defendant to explain to the Court on an ex parte basis [16] precisely how the Presidential and Vice Presidential documents would corroborate his claims, before a final decision is made on the issue of whether discovery of these materials should be compelled.[17] Defendant shall file a memorandum containing the requisite information within seven days hereof.

Second, insofar as President Reagan is concerned—the official who presumably had the closest official contact with this defendant—he is of course no longer a government official, but rather a *former* President. There is some doubt, for that reason, that the Court would have the authority under Rule 16 to require the Independent Counsel to obtain documents from him for production to the defendant. The Independent Counsel only prosecutes on behalf of, and is only responsible for production from, the United States government, and that may, or may not, include a former official, even a former Chief Executive. Moreover, many of the documents are in the former President's personal possession or that of the National Archives, and access to these documents may therefore depend upon the Presidential Records Act of 1978, 44 U.S.C. § 2201 *et seq.* rather than upon a mere Rule 16 determination.[18] Neither party has briefed the questions arising from these circumstances.

Accordingly, within seven days hereof, the Independent Counsel shall file a legal memorandum concerning his authority and responsibility, or lack thereof, to secure and produce Presidential and Vice Presidential documents not now in his possession, with particular consideration of the Presidential Records Act. Defendant shall have seven days thereafter to file a response, and the Independent Counsel may file a reply five days thereafter.[19]

## C. *Other Covert Operations*

▮ Defendant next claims that the existence or structure of other covert operations, some connected to the Iran–Contra enterprise, but many entirely unrelated, lend support to his defense theories. Accordingly he has made numerous requests for documents describing a host of other covert operations. With respect to requests which are in a sense a part of aspects of the Iran–Contra operation, the government has agreed to produce responsive documents. In accordance with defendant's demands,[20] in addition, the Court is

---

**16.** The Court considers the ex parte nature of the showing to be appropriate at this time because it does not wish to require the defendant to reveal to the prosecution the theories of his defense as a prerequisite to attempting to secure the discovery to which he may be entitled.

**17.** The Presidential and Vice Presidential papers may also raise an issue of privilege. However, a claim of privilege would have to be raised by or on behalf of the officials themselves. See *Nixon*, 418 U.S. at 713, 94 S.Ct. at 3110.

**18.** It may be that the documents would have to be sought instead pursuant to Rule 17, Fed.R.

Crim.P., directly by the defendant rather than through the prosecutor.

**19.** Defendant also requests congressional documents not in the possession of the Independent Counsel. The Independent Counsel has objected, defendant has not responded to the objection, and the Court can find no cases which support so sweeping a discovery obligation on the part of the government under Rule 16. *See, e.g., LaRouche,* 695 F.Supp. at 1280–81. The request is accordingly denied.

**20.** Recitation by the Court of these demands should not be taken to imply confirmation by

requiring the government to produce documents on other covert operations, if any, that are closely related to Iran–Contra. Documents concerning such related operations may lend support to defendant's claims that Iran–Contra activities were widely known or that he reasonably believed them to be legal. In these categories would be operations, *inter alia*, that were financed from funds obtained through the Iran initiative or otherwise connected to that initiative.

However, the Court is denying demands for documents regarding other alleged covert operations which, even as identified by defendant, bear only the most tangential relationship to the activities charged in the indictment.[21] Essentially, defendant has identified three types of such alleged operations: (1) those structurally similar to Iran–Contra but otherwise entirely unrelated; (2) those in which Poindexter may have played a role in the past; and (3) those which relate to the means used for pricing weapons. With respect to such requests, the relationship between what is being sought and what it is allegedly designed to prove is too remote for compelled production.

Defendant invites the Court in that respect to travel the following path: a covert operation, not forbidden by the Boland Amendment or any other law, and not related to Iran–Contra, took place with the support of the United States government; that operation led the defendant to believe that the Iran–Contra enterprise was likewise legal; because of his belief in the legality, he had no motive to conceal the NSC activities and he did not conceal them; this fact supports his claim of lack of the criminal intent requisite for several of the charges in the indictment; and thus, with the assistance of the documents on the non–Iran–Contra operations, he may be able to mount a defense to the charge of conspiracy as well as the other charges.

The Court declines to follow so remote and tenuous a path.

To the extent that documents in these categories are announced by the defendant to support his subjective belief in the legality of these activities or those he was describing to the Congress, they could in a sense be regarded as having some relevance to the issues in this case, but certainly not much more so than anything else the defendant might subjectively describe in that way. That is not sufficient basis for compelling discovery under Rule 16. There must be a showing of a tenable relationship between the materials sought and the preparation of the defense. See *United States v. Buckley*, 586 F.2d 498, 506 (5th Cir.1978) ("Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case ... [but] there must be some indication that the pretrial disclosure would have enabled the defendant significantly to alter the question of proof in his favor.")

Requests for such materials, moreover, have been represented by the government as requiring massive searches in a number of agencies of the Executive Branch. In fact, according to an affidavit filed by the general counsel of the CIA, compliance with all 147 requests in the defendant's original supplemental classified request of May 1988, which the government argues is largely mirrored by the current motion, would require "the review of literally millions of pages of highly classified documents at the CIA." The general counsel further states that the "process of retrieving, reviewing, and producing CIA documents responsive to this request could require months and consume thousands of hours of time by CIA personnel."

These requests would also require the production of masses of highly sensitive documents. Again, the CIA general counsel has declared that "I am advised by senior CIA officials with whom I consulted on this matter that compliance with the

the Court that such covert operations were conducted.

**21.** The Order being issued simultaneously herewith identifies by category number the operations with respect to which discovery is being granted and those with respect to which it is being denied.

Supplemental Motion would result in a greater compilation of sensitive information than any previous productions within the recollection of these individuals." And he goes on to assert that very few persons within the government, other than the President, have the security clearances necessary to review all the documents sought by defendant's motion, and that, within the CIA, only the Director and Deputy Director hold these clearances. See also, *United States v. Felt*, 491 F.Supp. 179 (D.D.C. 1979).

Under *Yunis, supra*, these extraordinarily burdensome and possibly dangerous consequences are not called for without a persuasive showing of the materiality of the evidence sought. With respect to covert operations not linked to Iran–Contra or to funds from the Iranian initiative, that showing has not been made.[22]

## IV

### Definitional Disputes

The parties disagree as to several definitional issues which affect the scope of discovery.

### A. Relevant Documents

■ Defendant's various discovery requests often make reference to "all relevant documents" in a particular area or related to a particular issue. In this respect, defendant defines "relevant" to include, in addition to the phrase "pursuant to the Iran initiative" and to "any of the conduct alleged in the indictment," as

1. the actual or contemplated sale of arms to elements in Iran;

2. the actual or contemplated use of the proceeds from such arms sales;

3. the provision of support for the Nicaraguan Resistance.

The government proposes to limit these definitions in a number of ways, most particularly by restricting the concept of relevance to sales and the proceeds from sales of the Iranian initiative and by also limiting the concept of support.

The Court has concluded that defendant's proposed definitions are unduly broad. They encompass, among other things, documents related to the sale of arms or use of the proceeds from such sales in general, that is, entirely apart from the Iran–Contra initiative which represents the single relevant specific charge in the indictment.

That definition also encompasses the general matter of humanitarian aid to the Contras—a subject that is not material to the issues in this case, for the Boland Amendment prohibits only support for military and paramilitary operations in Nicaragua.[23] In fact, one of the 1985 letters to the Congress explicitly distinguished between the two forms of assistance. See p. 1473 *supra*.

A ruling that included support other than military or paramilitary assistance to the Contras in the definition of relevance for purposes of discovery in this case, notwithstanding the limited reach of the Boland Amendment's prohibition, would also enormously expand the parameters of that discovery. Unlike the prohibited subject of military and paramilitary assistance, that

---

**22.** To be sure, as the Court has noted, the situation in this case differs from that presented in *Yunis* in that the defendant here is the former National Security Advisor to the President, and the production of classified documents to him therefore does not, in and of itself, create the security risks occasioned by a production of such documents to a foreign terrorist such as Yunis. This fact, however, does not take this case out of the *Yunis* rule that more than a mere theoretical relevance is required to compel the production of highly classified documents. It should be noted, too, that the wide dissemination of masses of sensitive national security documents does present some risk: a number of lawyers, paralegals, secretaries, and clerks, al-

beit with security clearances for purpose of this case, would presumably be working on these papers.

**23.** See note 10 *supra*. Defendant states correctly that the Boland Amendment prohibited activities that "directly or indirectly" provided support for the military or paramilitary activities of the Contras. It is therefore true that some forms of nonmilitary assistance could come close to the line. To the extent that documents exist regarding such forms of support, the government has represented that it will produce them. Hearing, September 6, 1989.

of humanitarian assistance—entirely legal—must have been considered, discussed, and implemented by many government departments and agencies in many activities, and evidenced by a great many documents.[24] The subject, if relevant at all, is not sufficiently material to justify the gross burden it would impose upon the government.

For the reasons stated, the Court will adopt the general definition of relevance proposed by the government, and where the Court has granted defendant's discovery requests, they are hereby limited accordingly.

### B. *Time Limits*

■ Defendant contends that the relevant time frame should be set at from June 30, 1983 to December 31, 1986, for purposes of the discovery of classified documents, and from June 30, 1983 to the present for unclassified documents. Defendant's proposed starting date is that of his effective assumption of his position as the Deputy Assistant to the President for National Security Affairs. The government contends that the appropriate starting date should be January 1, 1984.

There are no charges in the indictment relating to any actions taken prior to the second half of 1984,[25] and the conspiracy with which defendant is charged did not begin until 1985. Accordingly, the Court concludes that January 1, 1984 is the proper starting date.

Both defendant and the government agree that the appropriate end limit to classified discovery is December 31, 1986, and the Court hereby adopts that date. As for the unclassified discovery, defendant claims that it should extend to the present, but he offers no plausible reason for any

period beyond December 31, 1986, and the Court can find none. The closing date for unclassified discovery will also be December 31, 1986.

The Court emphasizes that this time frame for discovery provides a guideline with respect to the materiality of information only within the meaning of Rule 16(a)(1)(C); it is not intended to relieve the government from other production obligations. To the extent that the government locates evidence that is exculpatory, it must, of course, produce it regardless of its date. See Section V–D *infra*.

### C. *Documents "Resulting From" Meetings*

■ In several instances, the government objects to defendant's request for all documents "resulting from" a particular meeting among government officials, arguing that it would be unduly burdensome to require it to locate and produce these documents. The government also contends that the request is overbroad, in that scores of documents with very attenuated materiality may result indirectly from any given meeting.

Despite its objection to the terms "resulting from," the government suggests no means for narrowing the request, although it appears to be obvious that documents prepared as a consequence of a meeting the subject of which is material are prima facie likewise material. As for the practical problems advanced by the government, the Court agrees with defendant's observation that documents will frequently reveal on their face that they were prepared as a result of a particular event, such as a meeting.

---

**24.** The humanitarian assistance category, for example, presumably occupied all those government agencies that are normally involved in the grant of funds or the export of the particular goods. This assistance took place with congressional knowledge and approval throughout the period of the applicability of the Boland Amendment.

**25.** While the indictment does make reference to a few dates prior to 1984, these dates are purely

descriptive and not material to any actual charges in the indictment. For example, paragraph 6 of Count One states:

> Beginning with the overthrow of the Shah of Iran on or about January 16, 1979 and the seizure of the United States embassy in Iran and its staff on November 4, 1979, relations between the United States Government and the government of Iran were characterized by mutual hostility and tension.

In view of the breadth of the "resulting from" language, and the other considerations noted above, the Court directs the government to produce any relevant [26] document prepared by or at the request of a participant in a meeting devoted, in whole or in part, to Iran–Contra, which it is able to locate [27] that (1) responds directly to issues raised at that meeting, (2) memorializes an agreement there reached, (3) apprises someone of what transpired at the meeting, or (4) otherwise directly refers to the meeting. As to such documents, the government's objections of undue burdensomeness are rejected, and it is ordered to produce them.

## V

### Miscellaneous Matters

In addition to the fairly broad disputes outlined above, there are several disagreements regarding more discrete issues.

### A. Notes from Defendant Interviews

 The government has agreed to produce all FBI 302 reports regarding the substance of oral statements made by the defendant in accordance with Rule 16(a)(1)(A), but the defendant seeks in addition all notes or records upon which those 302 reports were based. The government contends that it is not obligated to produce these notes, conceding only that they will be produced pursuant to the Jencks Act, 18 U.S.C. § 3500, if an agent who prepared a report or took the notes is called as a witness. While the courts have reached differing conclusions regarding the production of these notes and memoranda, the Court of Appeals for this Circuit has made it clear that "[t]he decision on discoverability is emphatically a judicial decision." *United States v. Harrison,* 524 F.2d 421, 428 (D.C.Cir.1975).

**26.** If a particular meeting had a number of agenda items, only one of which was Iran–Contra, only the documents resulting from that agenda item need to be produced.

**27.** Defendant's suggestion that "the easiest way to determine what other documents were produced as a result of a meeting is to ask the people who attended that meeting", Motion to

It is the view of this Court that agents' notes that record verbatim what the defendant said are required to be produced under Rule 16(a)(1)(A). As the court noted in *Harrison,* in some cases the information contained in thorough notes taken from the witness himself might be more credible and more favorable to the defendant's position than the final version. *Harrison,* 524 F.2d at 428. It may also be noted that Judge Gesell ordered the government to produce to defendant Oliver North

> [a]ll notes and memoranda, whether or not verbatim, made at any time of interviews with North by lawyers or investigators on behalf of Independent Counsel, to the extent these memoranda purport to quote rather than characterize or interpret his statements.

This Court has concluded that such an order is appropriate under the circumstances of this case. Accordingly, the Court directs the government to produce to this defendant all notes and memoranda relating to interviews with him to the same extent as production was ordered with respect to North.

### B. Government Witnesses

 Defendant seeks the names and addresses of all government witnesses. The government did produce a list of its witnesses in April, 1988, before there was a severance of defendants. That list is likely to be considerably different from that which would be appropriate today, inasmuch as one year has elapsed since then, the current trial involves Poindexter alone, and the indictment has been narrowed. The government has agreed to provide an updated witness list, and the Court hereby requires it to do so within thirty days. There is no basis in law, however, for requiring the production of witnesses' addresses.

Compel at 24, is too facile. The prosecutor is not required to contact all the individuals— many of them may no longer be in government—who attended various meetings to determine what papers were produced as a result, and nothing in the Federal Rules requires such an exercise.

**1484**

### C. Case-in-chief Documents

 The government has produced documents that it intends to use in its case-in-chief, but defendant contends that, with respect to financial information and various calendar and diary pages, it has done no more than to identify several thousand pages, any of which it "may" rely on at trial. This broad brush approach, defendant contends, is not sufficient to meet its obligations. The Court agrees.

While the government's case or strategy may change in advance of trial or even during trial, there is no reason why it cannot be more specific as to which documents it currently intends to use, and there are many reasons, grounded in fairness to the defendant, the protection of his rights, and not least Rule 16(a)(1)(C), why it should be.

Within thirty days of the issuance of this Order, the government shall identify with greater specificity those among these thousands of documents in the financial, calendar, and diary areas that it intends to use at trial. This notification will not prevent the government from later introducing other documents from these materials on a limited scale, but it will give the defendant some notice as to which among the thousands of documents are likely to be part of the government's case-in-chief. *United States v. Turkish*, 458 F.Supp. 874, 882 (S.D.N.Y.1978), *aff'd*, 623 F.2d 769 (2nd Cir.1980).

Also with regard to the case-in-chief documents, defendant seeks an order compelling the government to identify all documents on which a witness will rely or to which he will refer. Here again, the government objects, but the better rule is that such information should be provided to the defendant. See Rule 16(a)(1)(C); *Turkish*, 458 F.Supp. at 882; *United States v. Countryside Farms, Inc.*, 428 F.Supp. 1150, 1154 (D.Utah 1977). This duty to produce does not encompass all documents

that a particular witness might have reviewed, or any documents that the government may use at trial to refresh a witness' recollection, as long as the use of that document was not planned in advance of the witness' testimony. *United States v. Feola*, 651 F.Supp. 1068, 1147 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir.1989).

### D. Jencks Act

 The government is technically not required to produce witness statements pursuant to the Jencks Act, 18 U.S.C. § 3500, in advance of trial.[28] However, in a case as complex as this, and involving as many witnesses, delay of production of these materials until the time of the witness' testimony would be likely to cause extensive trial delays, since production after the witness has testified on direct might, in fairness, require the Court in many instances to recess so as to permit defense counsel to consider the impact of the documents prior to cross examination.

In response to these considerations, the government has agreed to produce these materials two weeks before the trial date, as it did in the *North* case, and that is all that will affirmatively be required at this time.[29]

However, there apparently exist a considerable amount of prior testimony and other witness statements, and even a two-week period may therefore not be completely adequate for proper preparation of defense counsel for cross examination. Moreover, the Court is mindful of the fact that the late production requirements of the Jencks statute were adopted primarily to protect witnesses from intimidation or worse. Such interference may safely be discounted in this case. Accordingly, if the government anticipates that the Jencks material will be truly voluminous, and if it has the documents readily available, it should pro-

---

**28.** The Jencks Act provides that *"[a]fter a witness called by the United States has testified on direct examination,* the court shall, on motion of the defendant, order the United States to produce any statement ... of the witness in the possession of the United states which relates to the subject matter as to which the witness has

testified" (emphasis added). 18 U.S.C. § 3500(b).

**29.** Traditional impeachment materials, such as evidence of prior bad acts, which are not subject to release pursuant to the Jencks Act, should be produced at the same time.

duce the Jencks material one month prior to the start of the trial.

### E. *Brady Material*

■ Defendant has listed some 37 categories of materials that, in his view, are *Brady* materials. The government states in response that it will produce all information or evidence that may tend to negate the guilt of the defendant. Since in essence only the government knows what evidence exculpatory to a defendant it has in its possession, the ordinary procedure in criminal cases is to rely on the government's representations in that regard, unless circumstances are present that cast doubt thereon. The Court has been given no reason to doubt the government's claim that it is producing all material that could be exculpatory. That is the extent of the government's obligations under *Brady*. To the degree that the defendant seeks more, his request is denied.

The law is clear that the government is not required simply to turn all its files over to a defendant. *United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985). Nor is it required to provide to the defendant evidence that is not exculpatory but is merely not inculpatory and might therefore form the groundwork for some argument in favor of the defense. *United States v. Hauff*, 473 F.2d 1350, 1354 (7th Cir.1973); *United States v. Whitehorn*, 710 F.Supp. 803, 827 (D.D.C. 1989). Finally, as Judge Gesell noted in the *North* case, by seeking to compel the prosecution to conduct an affirmative government-wide search for possibly exculpatory evidence, the

> defendant ... expects too much.... [H]e perceives Independent Counsel's duty to be an affirmative duty to conduct a full Government-wide investigation in a search for any materials that might conceivably be useful to his defense.[30]

This Court agrees with that assessment and will follow it.

Defendant contends, finally, that some of the *Jencks* materials also contain exculpatory and impeachment evidence and should therefore be turned over immediately pursuant to *Brady v. Maryland, supra.* There is no question but that *Brady* imposes duties on the prosecution in addition to those created by the Jencks Act, and that in some cases the same evidence may be subject to both obligations. *United States v. Tarantino*, 846 F.2d 1384, 1414 and n. 11 (D.C.Cir.1988); *United States v. Pollack*, 534 F.2d 964, 973 (D.C.Cir.1976). The *Brady* obligations are not modified merely because they happen to arise in the context of witness statements. The government therefore has the obligation to produce to defendant immediately any exculpatory evidence contained in its Jencks materials, including exculpatory impeachment material, to the extent that the government is aware of such material, and it is so ordered. *United States ex rel. Marzeno v. Gengler*, 574 F.2d 730 (3rd Cir.1978).

## VI

### *Method and Manner of Production*

A final area of dispute between the parties involves not the scope but the manner of production.

### A. *Categorization*

■ Defendant demands that the government be required to categorize all the documents it produces, following the categories and subcategories contained in defendant's request papers. The government has countered with a more moderate categorization scheme, in two parts. First, as to documents that have not yet been produced, it would separately identify a number of specific discovery requests which are readily segregable;[31] second, it would identify the remaining documents by government discovery inventory item number, identifying as to each item the major

---

**30.** *United States v. North,* Order, July 13, 1988 at 2, 1988 WL 148527.

**31.** These identifications would relate to Discovery Requests A, B, C, D, E, F(54), F(55), F(56), F(57), F(58), F(60), F(61), F(64), F(69), F(87)–(89) (if limited as discussed in the discovery negotiations), G, H, I, J, L, M, N, O, and P, and Supplemental Requests VII(3) and VII(4).

category or categories (*e.g.*, Assistance to the Contras; Iran Initiative; Congressional Inquiries; Activities Following Disclosure) that are reflected in the documents contained in that item.

The Court is persuaded by the government that the demand for identification of each document according to the specific request to which it is responsive would be extremely and unnecessarily burdensome, for defendant's requests are divided into some 284 categories and subcategories of documents. This burden would be compounded by the fact that many of the categories are overlapping. Thus, any one document may be responsive to numerous different requests.[32] Defendant's proposed identification scheme would require the government to produce the same document many times in accordance with each request or to attempt to mark it with each of the different categories to which it is responsive.

In view of the fact that hundreds of thousands of pages of documents have been and will be produced in this case, compliance with defendant's demands would not only impose an enormous burden upon the government, but it would also have the further consequence of most likely bringing discovery to a halt for weeks if not for many months. The priority at this time is to produce to defendant those documents that may be material to his defense. The government's offer to identify documents according to several major, clearly defined categories should provide the defendant with ample information to allow him to prepare a defense. This is particularly true since the matters at issue are not new to defendant. He has testified before Congress; much of the government's evidence has already been presented in the *North* trial; and of course, as National Security Advisor, he may be deemed to be as familiar with the relevant material and its categorization as anyone.

B. *Security Classification*

Many of the documents produced by the government are not marked to reflect their level of classification or precisely what part of the information in the document is classified,[33] and defendant has requested that they all be reviewed and properly classified. The government responds that a classification review of all documents produced to defendant would be both burdensome and unnecessary since the overwhelming majority of the thousands of documents will never be introduced at trial. That is of course true. On the other hand, the defendant's ability to prepare for trial is hampered by his inability to determine the classification status of the various documents he seeks to use with witnesses or to designate pursuant to Section 5 of CIPA, 18 U.S.C.App. IV § 5. In an effort to satisfy defendant's needs without placing an insurmountable burden on the interagency group, the defendant has proposed and the government has agreed to a classification plan which the Court finds to be reasonable and adopts for further proceedings, as follows:

First, the government will stamp as classified all of the documents to be produced hereafter that include classified information, without necessarily attempting to identify specifically which part of the document is classified. Second, the defendant will turn over to the interagency group[34] for review a reasonable number of documents which it intends to use with witnesses and, eventually, at trial.[35] As to these documents, the interagency group will promptly perform a full classification review and return the documents to defendant with proper classifications. However, members of the group are hereby directed not to identify either to the Independent

---

**32.** The government includes in its papers a document at Exhibit C which it contends is responsive to at least 14 different requests.

**33.** This appears to be a consequence of the practices of the agencies from which the documents originated.

**34.** The interagency group, comprised of representatives from national security agencies, reviews documents for classification purposes.

**35.** The estimate given by defendant's counsel at the hearing on September 6, 1989 was 1,500 to 2,000 documents.

Counsel or to their respective agencies which documents were turned over to them by the defendant for review. In this way, once again, defendant will not have to reveal the details of his defenses in advance of the trial. Finally, defendant need not designate any documents pursuant to CIPA until ten days after the interagency group has completed its classification review of such documents.

## VII

### *Conclusion*

The Court is pleased by the thoughtful assistance counsel for the parties have rendered on difficult legal issues, and impressed by the cooperative attitude they have been able to display without in the slightest neglecting their duty to engage in vigorous and effective advocacy on behalf of their respective clients. Agreements have been reached regarding a considerable number of discovery requests as well as on many procedural questions. What properly remained for the Court to decide were those disagreements fundamental or central to the dispute in the case itself.

The Court believes that the decisions announced above will fully protect defendant's rights—the consideration that must be paramount in a criminal case—while also protecting the government from overburdensome discovery and from production that would unnecessarily intrude into highly sensitive matters without contributing anything material to the defense. As for the Presidential and Vice Presidential documents, including such personal papers as diaries and notes, they will be ordered produced to the defendant if they are material to the preparation of his defense; however, the Court will require that it be established to a substantial degree of certainty that this could be their effect before such a step is taken.

An Order which disposes of the parties' disputes with respect to the discovery of specific categories of documents is being issued simultaneously herewith.

### ORDER

This Order disposes of the Defendant's Supplemental Classified Request and the documents requested in Category F of the Proposed Revised Request for Discovery. The Court has reviewed the specific categories of documents requested by the defendant,[1] as well as the papers in support of the requests and in opposition thereto, and the entire record herein, and, based upon the findings, conclusions, and principles outlined in the accompanying Opinion, it is this 11th day of September 1989, subject to the limitations and modifications set forth in the Opinion, including the Court's ruling on the definition of relevance,

ORDERED that the defendant's motion to compel be and it is hereby granted for the following categories of documents: F(1)(a), (d)-(g); F(3); F(5); F(11); F(14); F(16); F(32)(c); F(59); F(61); F(77); F(91); F(100); F(105); F(111); II(1)-(6); V(9); V(11); V(25); V(29) (but limited to the two vessels); V(30); V(32); V(36); V(38)-(39); VI(4); VII(1)(h), (u), (w), (y), (aa); and it is further

ORDERED that in view of the fact that, with respect to the following categories, the government's representations as to what it will produce[2] conform with the Court's directives in the accompanying Opinion, such representations are deemed adequate, except as modified by the Opinion on matters such as the relevant time frame and documents "resulting from" meetings, and the government shall accordingly produce the following categories of documents: F(39)-(40), F(42)(b); F(57)-(58); F(62); F(65)-(68); F(97); F(101); F(104); F(106)-(107); F(109); I(1); I(7); II(7)-(15); III(1)-(7); III(11); V(1); V(4); V(6)-(8); V(10); V(12)-(16); V(18); V(20)-(24); V(26)-(28); V(31); V(33)-(34); V(37); VI(1)-

---

1. *See* Proposed Revised Request for Discovery, Exhibit E to the Motion to Compel; the Revised Classified Supplement at Exhibit D; and the government's category-by-category response, *see* Exhibits F and G to the Opposition to the Defendant's Motion to Compel.

2. See Exhibit F–G, and government's Response dated September 5, 1989.

(2); VII(1)(a)-(g), (i)-(p), (r), (s), (v), (x); VII(3); and it is further

ORDERED that the defendant's motion to compel the production of documents in the following categories be and it is hereby denied: F(1)(b); F(4); F(6); F(60); F(92)–(93); F(110); I(2)–(6); III(8)–(9); III(12)–(13); V(3); V(5); V(17); V(19); V(35); V(40); VI(3); VII(1)(q), (t), (z),[3] and it is further

ORDERED that within five days of the date of this order, the government shall produce the documents in VII(2) for an in camera inspection.

---

**3.** The Court understands that some agreement has been reached for the following categories, and no further action by the Court is required at this time. F(1)(c); F(9)–(10); F(12)–(13); F(17); F(18)–(31); F(32)(a)-(b); F(36)(c)-(d); F(37)–(38); F(41)(a)(b)(d)(e); F(42)(a)(c)(d)(e); F(43)–(45); F(48)–(56); F(63)–(64); F(69)–(76); F(78)–(90); F(94)–(96); F(98)–(99); F(102)–(103); F(108); II(16); III(10); III(14); V(2); VII(4). The Court also understands that the requests for categories F(15) and VII(1)(bb) have been deferred.

The defendant has not pursued his requests for the following categories of documents in his motion to compel, and the Court assumes that these requests have been abandoned. F(2); F(7)–(8); F(33)–(35); F(36)(a)(b); F(41)(c); F(46)–(47); F(112); and IV.